OLIPHANT *v.* SUQUAMISH INDIAN TRIBE ET AL.

No. 76–5729.   Argued January 9, 1978—Decided March 6, 1978*

REHNQUIST, J., delivered the opinion of the Court, in which STEWART, WHITE, BLACKMUN, POWELL, and STEVENS, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BURGER, C. J., joined, *post,* p. 212. BRENNAN, J., took no part in the consideration or decision of the cases.

*Philip P. Malone* argued the cause and filed briefs for petitioners.   *Slade Gorton,* Attorney General, argued the cause for the State of Washington as *amicus curiae* urging reversal. With him on the brief were *Edward B. Mackie,* Deputy

---

*Together with *Belgarde* v. *Suquamish Indian Tribe et al.,* on certiorari before judgment to the same court (see this Court's Rule 23 (5)).

Attorney General, and *Timothy R. Malone,* Assistant Attorney General.

*Barry D. Ernstoff* argued the cause for respondents. With him on the brief was *Steven H. Chestnut.* *H. Bartow Farr III* argued the cause for the United States as *amicus curiae* urging affirmance. On the brief were *Solicitor General McCree, Assistant Attorneys General Days* and *Moorman, Louis F. Claiborne,* and *Miriam R. Eisenstein.*†

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

Two hundred years ago, the area bordering Puget Sound consisted of a large number of politically autonomous Indian villages, each occupied by from a few dozen to over 100 Indians. These loosely related villages were aggregated into a series of Indian tribes, one of which, the Suquamish, has become the focal point of this litigation. By the 1855 Treaty of Point Elliott, 12 Stat. 927, the Suquamish Indian Tribe

---

†*William J. Janklow,* Attorney General, and *David L. Knudson* and *Tom D. Tobin,* Special Assistant Attorneys General, filed a brief for the State of South Dakota et al. as *amici curiae* urging reversal, joined by the Attorneys General for their respective States as follows: *Michael T. Greely* of Montana, *Paul L. Douglas* of Nebraska, *Robert F. List* of Nevada, *Toney Anaya* of New Mexico, *Allen I. Olson* of North Dakota, *James A. Redden* of Oregon, and *V. Frank Mendicino* of Wyoming.

Briefs of *amici curiae* urging affirmance were filed by *Arthur Lazarus, Jr.,* for the Association on American Indian Affairs, Inc., et al.; by *Bryan N. Freeman, Z. Simpson Cox,* and *Richard B. Wilks* for the Colorado Indian Tribes et al.; by *Robert L. Pirtle* for the Confederated Tribes of the Colville Indian Reservation, Washington, et al.; by *Charles A. Hobbs* for the National Congress of American Indians et al.; and by *Stephen G. Boyden* and *Scott C. Pugsley* for the Ute Indian Tribe of the Uintah and Ouray Reservation.

Briefs of *amici curiae* were filed by *C. Danny Clem* for Kitsap County; by *Michael Taylor* and *Daniel A. Raas* for the Lummi Indian Tribe et al.; by *David H. Getches* and *Ralph W. Johnson* for the National American Indian Court Judges Assn.; and by *George B. Christensen* and *Joseph S. Fontana* for the National Tribal Chairmen's Assn.

relinquished all rights that it might have had in the lands of the State of Washington and agreed to settle on a 7,276-acre reservation near Port Madison, Wash. Located on Puget Sound across from the city of Seattle, the Port Madison Reservation is a checkerboard of tribal community land, allotted Indian lands, property held in fee simple by non-Indians, and various roads and public highways maintained by Kitsap County.[1]

The Suquamish Indians are governed by a tribal government which in 1973 adopted a Law and Order Code. The Code, which covers a variety of offenses from theft to rape, purports to extend the Tribe's criminal jurisdiction over both Indians and non-Indians.[2] Proceedings are held in the Suquamish

---

[1] According to the District Court's findings of fact: "[The] Port Madison Indian Reservation consists of approximately 7276 acres of which approximately 63% thereof is owned in fee simple absolute by non-Indians and the remainder 37% is Indian-owned lands subject to the trust status of the United States, consisting mostly of unimproved acreage upon which no persons reside. Residing on the reservation is an estimated population of approximately 2928 non-Indians living in 976 dwelling units. There lives on the reservation approximately 50 members of the Suquamish Indian Tribe. Within the reservation are numerous public highways of the State of Washington, public schools, public utilities and other facilities in which neither the Suquamish Indian Tribe nor the United States has any ownership or interest." App. 75.

The Suquamish Indian Tribe, unlike many other Indian tribes, did not consent to non-Indian homesteading of unallotted or "surplus" lands within their reservation pursuant to 25 U. S. C. § 348 and 43 U. S. C. §§ 1195–1197. Instead, the substantial non-Indian population on the Port Madison Reservation is primarily the result of the sale of Indian allotments to non-Indians by the Secretary of the Interior. Congressional legislation has allowed such sales where the allotments were in heirship, fell to "incompetents," or were surrendered in lieu of other selections. The substantial non-Indian landholdings on the Reservation are also a result of the lifting of various trust restrictions, a factor which has enabled individual Indians to sell their allotments. See 25 U. S. C. §§ 349, 392.

[2] Notices were placed in prominent places at the entrances to the Port Madison Reservation informing the public that entry onto the Reservation

Indian Provisional Court. Pursuant to the Indian Civil Rights Act of 1968, 82 Stat. 77, 25 U. S. C. § 1302, defendants are entitled to many of the due process protections accorded to defendants in federal or state criminal proceedings.[3] However, the guarantees are not identical. Non-Indians, for example, are excluded from Suquamish tribal court juries.[4]

Both petitioners are non-Indian residents of the Port Madison Reservation. Petitioner Mark David Oliphant was arrested by tribal authorities during the Suquamish's annual Chief Seattle Days celebration and charged with assaulting a tribal officer and resisting arrest. After arraignment before the tribal court, Oliphant was released on his own recognizance. Petitioner Daniel B. Belgarde was arrested by tribal authorities after an alleged high-speed race along the Reservation highways that only ended when Belgarde collided with a tribal police vehicle. Belgarde posted bail and was released. Six days later he was arraigned and charged under the tribal Code with "recklessly endangering another person" and injuring tribal property. Tribal court proceedings against both petitioners have been stayed pending a decision in this case.

Both petitioners applied for a writ of habeas corpus to the United States District Court for the Western District of Washington. Petitioners argued that the Suquamish Indian Provisional Court does not have criminal jurisdiction over non-Indians. In separate proceedings, the District Court dis-

would be deemed implied consent to the criminal jurisdiction of the Suquamish tribal court.

[3] In *Talton* v. *Mayes,* 163 U. S. 376 (1896), this Court held that the Bill of Rights in the Federal Constitution does not apply to Indian tribal governments.

[4] The Indian Civil Rights Act of 1968 provides for "a trial by jury of not less than six persons," 25 U. S. C. § 1302 (10), but the tribal court is not explicitly prohibited from excluding non-Indians from the jury even where a non-Indian is being tried. In 1977, the Suquamish Tribe amended its Law and Order Code to provide that only Suquamish tribal members shall serve as jurors in tribal court.

agreed with petitioners' argument and denied the petitions. On August 24, 1976, the Court of Appeals for the Ninth Circuit affirmed the denial of habeas corpus in the case of petitioner Oliphant. *Oliphant* v. *Schlie,* 544 F. 2d 1007. Petitioner Belgarde's appeal is still pending before the Court of Appeals.[5] We granted certiorari, 431 U. S. 964, to decide whether Indian tribal courts have criminal jurisdiction over non-Indians. We decide that they do not.

## I

Respondents do not contend that their exercise of criminal jurisdiction over non-Indians stems from affirmative congressional authorization or treaty provision.[6] Instead, respondents

---

[5] Belgarde's petition for certiorari was granted while his appeal was still pending before the Court of Appeals for the Ninth Circuit. No further proceedings in that court have been held pending our decision.

[6] Respondents do contend that Congress has "confirmed" the power of Indian tribes to try and to punish non-Indians through the Indian Reorganization Act of 1934, 48 Stat. 987, 25 U. S. C. § 476, and the Indian Civil Rights Act of 1968, 25 U. S. C. § 1302. Neither Act, however, addresses, let alone "confirms," tribal criminal jurisdiction over non-Indians. The Indian Reorganization Act merely gives each Indian tribe the right "to organize for its common welfare" and to "adopt an appropriate constitution and bylaws." With certain specific additions not relevant here, the tribal council is to have such powers as are vested "by existing law." The Indian Civil Rights Act merely extends to "any person" within the tribe's jurisdiction certain enumerated guarantees of the Bill of Rights of the Federal Constitution.

As respondents note, an early version of the Indian Civil Rights Act extended its guarantees only to "American Indians," rather than to "any person." The purpose of the later modification was to extend the Act's guarantees to "all persons who may be subject to the jurisdiction of tribal governments, whether Indians or non-Indians." Summary Report on the Constitutional Rights of American Indians, Subcommittee on Constitutional Rights of the Senate Committee on the Judiciary, 89th Cong., 2d Sess., 10 (1966). But this change was certainly not intended to give Indian tribes criminal jurisdiction over non-Indians. Nor can it be read to "confirm" respondents' argument that Indian tribes have inherent criminal jurisdiction over non-Indians. Instead, the modification merely demonstrates

urge that such jurisdiction flows automatically from the "Tribe's retained inherent powers of government over the Port Madison Indian Reservation." Seizing on language in our opinions describing Indian tribes as "quasi-sovereign entities," see, *e. g., Morton* v. *Mancari,* 417 U. S. 535, 554 (1974), the Court of Appeals agreed and held that Indian tribes, "though conquered and dependent, retain those powers of autonomous states that are neither inconsistent with their status nor expressly terminated by Congress." According to the Court of Appeals, criminal jurisdiction over anyone committing an offense on the reservation is a "sine qua non" of such powers.

The Suquamish Indian Tribe does not stand alone today in its assumption of criminal jurisdiction over non-Indians. Of the 127 reservation court systems that currently exercise criminal jurisdiction in the United States, 33 purport to extend that jurisdiction to non-Indians.[7] Twelve other Indian tribes have enacted ordinances which would permit the assumption of criminal jurisdiction over non-Indians. Like the Suquamish these tribes claim authority to try non-Indians not on the basis of congressional statute or treaty provision but by reason of their retained national sovereignty.

The effort by Indian tribal courts to exercise criminal

Congress' desire to extend the Act's guarantees to non-Indians if and where they come under a tribe's criminal or civil jurisdiction by either treaty provision or Act of Congress.

[7] Of the 127 courts currently operating on Indian reservations, 71 (including the Suquamish Indian Provisional Court) are tribal courts, established and functioning pursuant to tribal legislative powers; 30 are "CFR Courts" operating under the Code of Federal Regulations, 25 CFR § 11.1 *et seq.* (1977); 16 are traditional courts of the New Mexico pueblos; and 10 are conservation courts. The CFR Courts are the offspring of the Courts of Indian Offenses, first provided for in the Indian Department Appropriations Act of 1888, 25 Stat. 217, 233. See W. Hagan, Indian Police and Judges (1966). By regulations issued in 1935, the jurisdiction of CFR Courts is restricted to offenses committed by Indians within the reservation. 25 CFR § 11.2 (a) (1977). The case before us is concerned only with the criminal jurisdiction of tribal courts.

jurisdiction over non-Indians, however, is a relatively new phenomenon. And where the effort has been made in the past, it has been held that the jurisdiction did not exist. Until the middle of this century, few Indian tribes maintained any semblance of a formal court system. Offenses by one Indian against another were usually handled by social and religious pressure and not by formal judicial processes; emphasis was on restitution rather than on punishment. In 1834 the Commissioner of Indian Affairs described the then status of Indian criminal systems: "With the exception of two or three tribes, who have within a few years past attempted to establish some few laws and regulations among themselves, the Indian tribes are without laws, and the chiefs without much authority to exercise any restraint." H. R. Rep. No. 474, 23d Cong., 1st Sess., 91 (1834).

It is therefore not surprising to find no specific discussion of the problem before us in the volumes of the United States Reports. But the problem did not lie entirely dormant for two centuries. A few tribes during the 19th century did have formal criminal systems. From the earliest treaties with these tribes, it was apparently assumed that the tribes did not have criminal jurisdiction over non-Indians absent a congressional statute or treaty provision to that effect. For example, the 1830 Treaty with the Choctaw Indian Tribe, which had one of the most sophisticated of tribal structures, guaranteed to the Tribe "the jurisdiction and government of all the persons and property that may be within their limits." Despite the broad terms of this governmental guarantee, however, the Choctaws at the conclusion of this treaty provision "express *a wish* that Congress *may grant* to the Choctaws the right of punishing by their own laws any white man who shall come into their nation, and infringe any of their national regulations." [8]    Art. 4, 7 Stat. 333 (emphasis added). Such a

---

[8] The history of Indian treaties in the United States is consistent with the principle that Indian tribes may not assume criminal jurisdiction

request for affirmative congressional authority is inconsistent with respondents' belief that criminal jurisdiction over non-Indians is inherent in tribal sovereignty. Faced by attempts

over non-Indians without the permission of Congress. The earliest treaties typically expressly provided that "any citizen of the United States, who shall do an injury to any Indian of the [tribal] nation, or to any other Indian or Indians residing in their towns, and under their protection, shall be punished according to the laws of the United States." See, *e. g.,* Treaty with the Shawnees, Art. III, 7 Stat. 26 (1786). While, as elaborated further below, these provisions were not necessary to remove criminal jurisdiction over non-Indians from the Indian tribes, they would naturally have served an important function in the developing stage of United States-Indian ·relations by clarifying jurisdictional limits of the Indian tribes. The same treaties generally provided that "[i]f any citizen of the United States . . . shall attempt to settle on any of the lands hereby allotted to the Indians to live and hunt on, such person shall forfeit the protection of the United States of America, and the Indians may punish him or not as they please." See, *e. g.,* Treaty with the Choctaws, Art. IV, 7 Stat. 22 (1786). Far from representing a recognition of any inherent Indian criminal jurisdiction over non-Indians settling on tribal lands, these provisions were instead intended as a means of discouraging non-Indian settlements on Indian territory, in contravention of treaty provisions to the contrary. See 5 Annals of Cong. 903–904 (1796). Later treaties dropped this provision and provided instead that non-Indian settlers would be removed by the United States upon complaint being lodged by the tribe. See, *e. g.,* Treaty with the Sacs and Foxes, 7 Stat. 84 (1804).

As the relationship between Indian tribes and the United States developed through the passage of time, specific provisions for the punishment of non-Indians by the United States, rather than by the tribes, slowly disappeared from the treaties. Thus, for example, none of the treaties signed by Washington Indians in the 1850's explicitly proscribed criminal prosecution and punishment of non-Indians by the Indian tribes. As discussed below, however, several of the treaty provisions can be read as recognizing that criminal jurisdiction over non-Indians would be in the United States rather than in the tribes. The disappearance of provisions explicitly providing for the punishment of non-Indians by the United States, rather than by the Indian tribes, coincides with and is at least partly explained by the extension of federal enclave law over non-Indians in the Trade and Intercourse Acts and the general recognition by Attorneys General and lower federal courts that Indians did not have jurisdiction

of the Choctaw Tribe to try non-Indian offenders in the early 1800's the United States Attorneys General also concluded that the Choctaws did not have criminal jurisdiction over non-Indians absent congressional authority. See 2 Op. Atty. Gen. 693 (1834); 7 Op. Atty. Gen. 174 (1855). According to the Attorney General in 1834, tribal criminal jurisdiction over non-Indians is, *inter alia,* inconsistent with treaty provisions recognizing the sovereignty of the United States over the territory assigned to the Indian nation and the dependence of the Indians on the United States.

At least one court has previously considered the power of Indian courts to try non-Indians and it also held against jurisdiction.[9] In *Ex parte Kenyon,* 14 F. Cas. 353 (No. 7,720)

---

to try non-Indians. See *infra,* at 198–201. When it was felt necessary to expressly spell out respective jurisdictions, later treaties still provided that criminal jurisdiction over non-Indians would be in the United States. See, *e. g.,* Treaty with the Utah-Tabeguache Band, Art. 6, 13 Stat. 674 (1863).

Only one treaty signed by the United States has ever provided for any form of tribal criminal jurisdiction over non-Indians (other than in the illegal-settler context noted above). The first treaty signed by the United States with an Indian tribe, the 1778 Treaty with the Delawares, provided that neither party to the treaty could "proceed to the infliction of punishments on the citizens of the other, otherwise than by securing the offender or offenders by imprisonment, or any other competent means, till a fair and impartial trial can be had by judges or juries *of both parties,* as near as can be to the laws, customs and usages of the contracting parties and natural justice: *The mode of such tryals to be hereafter fixed by the wise men of the United States in Congress assembled,* with the assistance of . . . deputies of the Delaware nation . . . ." Treaty with the Delawares, Art. IV, 7 Stat. 14 (emphasis added). While providing for Delaware participation in the trial of non-Indians, this treaty section established that non-Indians could only be tried under the auspices of the United States and in a manner fixed by the Continental Congress.

[9] According to Felix Cohen's Handbook of Federal Indian Law 148 (U. S. Dept. of the Interior 1941) "attempts of tribes to exercise jurisdiction over non-Indians . . . have been generally condemned by the federal courts since the end of the treaty-making period, and the writ of habeas corpus has been used to discharge white defendants from tribal custody."

(WD Ark. 1878), Judge Isaac C. Parker, who as District Court Judge for the Western District of Arkansas was constantly exposed to the legal relationships between Indians and non-Indians,[10] held that to give an Indian tribal court "jurisdiction of the person of an offender, such offender must be an Indian." *Id.*, at 355. The conclusion of Judge Parker was reaffirmed

---

[10] Judge Parker sat as the judge of the United States District Court for the Western District of Arkansas from 1875 until 1896. By reason of the laws of Congress in effect at the time, that particular court not only handled the normal docket of federal cases arising in the Western District of Arkansas, but also had criminal jurisdiction over what was then called the "Indian Territory." This area varied in size during Parker's tenure; at one time it extended as far west as the eastern border of Colorado, and always included substantial parts of what would later become the State of Oklahoma. In the exercise of this jurisdiction over the Indian Territory, the Court in which he sat was necessarily in constant contact with individual Indians, the tribes of which they were members, and the white men who dealt with them and often preyed upon them.

Judge Parker's views of the law were not always upheld by this Court. See 2 J. Wigmore, Evidence § 276, pp. 115–116, n. 3 (3d ed. 1940). A reading of Wigmore, however, indicates that he was as critical of the decisions of this Court there mentioned as this Court was of the evidentiary rulings of Judge Parker. Nothing in these long forgotten disputes detracts from the universal esteem in which the Indian tribes which were subject to the jurisdiction of his court held Judge Parker. One of his biographers, describing the judge's funeral, states that after the grave was filled "[t]he principal chief of the Choctaws, Pleasant Porter, came forward and placed a wreath of wild flowers on the grave." H. Croy, He Hanged Them High 222 (1952).

It may be that Judge Parker's views as to the ultimate destiny of the Indian people are not in accord with current thinking on the subject, but we have observed in more than one of our cases that the views of the people on this issue as reflected in the judgments of Congress itself have changed from one era to the next. See *Kake Village v. Egan*, 369 U. S. 60, 71–74 (1962). There cannot be the slightest doubt that Judge Parker was, by his own lights and by the lights of the time in which he lived, a judge who was thoroughly acquainted with and sympathetic to the Indians and Indian tribes which were subject to the jurisdiction of his court, as well as familiar with the law which governed them. See generally Hell on the Border (1971, J. Gregory & R. Strickland, eds.)

only recently in a 1970 opinion of the Solicitor of the Department of the Interior. See *Criminal Jurisdiction of Indian Tribes over Non-Indians*, 77 I. D. 113.[11]

While Congress was concerned almost from its beginning with the special problems of law enforcement on the Indian reservations, it did not initially address itself to the problem of tribal jurisdiction over non-Indians. For the reasons previously stated, there was little reason to be concerned with assertions of tribal court jurisdiction over non-Indians because of the absence of formal tribal judicial systems. Instead, Congress' concern was with providing effective protection for the Indians "from the violences of the lawless part of our frontier inhabitants." Seventh Annual Address of President George Washington, 1 Messages and Papers of the Presidents, 1789–1897, pp. 181, 185 (J. Richardson ed., 1897). Without such protection, it was felt that "all the exertions of the Government to prevent destructive retaliations by the Indians will prove fruitless and all our present agreeable prospects illusory." *Ibid.* Beginning with the Trade and Intercourse Act of 1790, 1 Stat. 137, therefore, Congress assumed federal jurisdiction over offenses by non-Indians against Indians which "would be punishable by the laws of [the] state or district . . . if the offense had been committed against a citizen or white inhabitant thereof." In 1817, Congress went one step further and extended federal enclave law to the Indian country; the only exception was for "any offence committed by one Indian against another." 3 Stat. 383, now codified, as amended, 18 U. S. C. § 1152.

It was in 1834 that Congress was first directly faced with the prospect of Indians trying non-Indians. In the Western Territory bill,[12] Congress proposed to create an Indian territory beyond the western-directed destination of the settlers;

---

[11] The 1970 opinion of the Solicitor was withdrawn in 1974 but has not been replaced. No reason was given for the withdrawal.

[12] See H. R. Rep. No. 474, 23d Cong., 1st Sess., 36 (1834).

the territory was to be governed by a confederation of Indian tribes and was expected ultimately to become a State of the Union. While the bill would have created a political territory with broad governing powers, Congress was careful not to give the tribes of the territory criminal jurisdiction over United States officials and citizens traveling through the area.[13] The reasons were quite practical:

> "Officers, and persons in the service of the United States, and persons required to reside in the Indian country by treaty stipulations, must necessarily be placed under the protection, and subject to the laws of the United States. To persons merely travelling in the Indian country the same protection is extended. The want of fixed laws, of competent tribunals of justice, which must for some time continue in the Indian country, absolutely requires for the peace of both sides that this protection should be extended." H. R. Rep. No. 474, 23d Cong., 1st Sess., 18 (1834).

---

[13] The Western Territory bill, like the early Indian treaties, see n. 6, *supra*, did not extend the protection of the United States to non-Indians who *settled* without Government business in Indian territory. See Western Territory bill, § 6, in H. R. Rep. No. 474, *supra*, at 35; *id.*, at 18. This exception, like that in the early treaties, was presumably meant to discourage settlement on land that was reserved exclusively for the use of the various Indian tribes. Today, many reservations, including the Port Madison Reservation, have extensive non-Indian populations. The percentage of non-Indian residents grew as a direct and intended result of congressional policies in the late 19th and early 20th centuries promoting the assimilation of the Indians into the non-Indian culture. Respondents point to no statute, in comparison to the Western Territory bill, where Congress has intended to give Indian tribes jurisdiction today over non-Indians residing within reservations.

Even as drafted, many Congressmen felt that the bill was too radical a shift in United States-Indian relations and the bill was tabled. See 10 Cong. Deb. 4779 (1834). While the Western Territory bill was resubmitted several times in revised form, it was never passed. See generally R. Gittinger, The Formation of the State of Oklahoma (1939).

Congress' concern over criminal jurisdiction in this proposed Indian Territory contrasts markedly with its total failure to address criminal jurisdiction over non-Indians on other reservations, which frequently bordered non-Indian settlements. The contrast suggests that Congress shared the view of the Executive Branch and lower federal courts that Indian tribal courts were without jurisdiction to try non-Indians.

This unspoken assumption was also evident in other congressional actions during the 19th century. In 1854, for example, Congress amended the Trade and Intercourse Act to proscribe the prosecution in federal court of an Indian who has already been tried in tribal court. § 3, 10 Stat. 270, now codified, as amended, 18 U. S. C. § 1152. No similar provision, such as would have been required by parallel logic if tribal courts had jurisdiction over non-Indians, was enacted barring retrial of non-Indians. Similarly, in the Major Crimes Act of 1885, Congress placed under the jurisdiction of federal courts Indian offenders who commit certain specified major offenses. Act of Mar. 3, 1885, § 9, 23 Stat. 385, now codified, as amended, 18 U. S. C. § 1153. If tribal courts may try non-Indians, however, as respondents contend, those tribal courts are free to try non-Indians even for such major offenses as Congress may well have given the federal courts *exclusive* jurisdiction to try members of their own tribe committing the exact same offenses.[14]

---

[14] The Major Crimes Act provides that Indians committing any of the enumerated offenses "shall be subject to the same laws and penalties as all other persons committing any of the above offenses, *within the exclusive jurisdiction of the United States.*" (Emphasis added.) While the question has never been directly addressed by this Court, Courts of Appeals have read this language to exclude tribal jurisdiction over the Indian offender. See, *e. g., Sam* v. *United States,* 385 F. 2d 213, 214 (CA10 1967); *Felicia* v. *United States,* 495 F. 2d 353, 354 (CA8 1974). We have no reason to decide today whether jurisdiction under the Major Crimes Act is exclusive.

The legislative history of the original version of the Major Crimes Act, which was introduced as a House amendment to the Indian Appropriation

In 1891, this Court recognized that Congress' various actions and inactions in regulating criminal jurisdiction on Indian reservations demonstrated an intent to reserve jurisdiction over non-Indians for the federal courts.  In *In re Mayfield,* 141 U. S. 107, 115–116 (1891), the Court noted that the policy of Congress had been to allow the inhabitants of the Indian country "such power of self-government as was thought to be consistent with the safety of the white population with which they may have come in contact, and to encourage them as far as possible in raising themselves to our standard of civilization."  The "general object" of the congressional statutes was to allow Indian nations criminal "jurisdiction of all controversies between Indians, or where a member of the nation is the only party to the proceeding, and to reserve to the courts of the United States jurisdiction of all actions to which its own citizens are parties on either side."  *Ibid.*  While Congress never expressly forbade Indian tribes to impose criminal penalties on non-Indians, we now make express our implicit conclusion of nearly a century ago that Congress consistently believed this to be the necessary result of its repeated legislative actions.

In a 1960 Senate Report, that body expressly confirmed its

---

Act of 1855, creates some confusion on the question of exclusive jurisdiction.  As originally worded, the amendment would have provided for trial in the United States courts *"and not otherwise."*  Apparently at the suggestion of Congressman Budd, who believed that concurrent jurisdiction in the courts of the United States was sufficient, the words "and not otherwise" were deleted when the amendment was later reintroduced.  See 16 Cong. Rec. 934–935 (1885).  However, as finally accepted by the Senate and passed by both Houses, the amendment did provide that the Indian offender would be punished as any other offender, "within the exclusive jurisdiction of the United States."  The issue of exclusive jurisdiction over major crimes was mooted for all practical purposes by the passage of the Indian Civil Rights Act of 1968 which limits the punishment that can be imposed by Indian tribal courts to a term of 6 months or a fine of $500.

assumption that Indian tribal courts are without inherent jurisdiction to try non-Indians, and must depend on the Federal Government for protection from intruders.[15] In considering a statute that would prohibit unauthorized entry upon Indian land for the purpose of hunting or fishing, the Senate Report noted:

"The problem confronting Indian tribes with sizable reservations is that the United States provides no protection against trespassers comparable to the protection it gives to Federal property as exemplified by title 18, United States Code, section 1863 [trespass on national forest lands]. Indian property owners should have the same protection as other property owners. For example, a private hunting club may keep nonmembers off its game lands or it may issue a permit for a fee. One who comes on such lands without permission may be prosecuted under State law but a non-Indian trespasser on an Indian reservation enjoys immunity. *This is by reason of the fact that Indian tribal law is enforcible against Indians only; not against non-Indians.*

.        .        .        .        .

"*Non-Indians are not subject to the jurisdiction of Indian courts and cannot be tried in Indian courts on trespass*

---

[15] In 1977, a congressional Policy Review Commission, citing the lower court decisions in *Oliphant* and *Belgarde,* concluded that "[t]here is an established legal basis for tribes to exercise jurisdiction over non-Indians." 1 Final Report of the American Indian Policy Review Commission 114, 117, 152–154 (1977). However, the Commission's report does not deny that for almost 200 years before the lower courts decided *Oliphant* and *Belgarde,* the three branches of the Federal Government were in apparent agreement that Indian tribes do not have jurisdiction over non-Indians. As the Vice Chairman of the Commission, Congressman Lloyd Meeds, noted in dissent, "such jurisdiction has generally not been asserted and . . . the lack of legislation on this point reflects a congressional assumption that there was no such tribal jurisdiction." Final Report, *supra,* at 587.

*charges.* Further, there are no Federal laws which can be invoked against trespassers.

    .       .       .       .       .

"The committee has considered this bill and believes that the legislation is meritorious. The legislation will give to the Indian tribes and to individual Indian owners certain rights that now exist as to others, and fills a gap in the present law for the protection of their property." S. Rep. No. 1686, 86th Cong., 2d Sess., 2–3 (1960) (emphasis added).

II

While not conclusive on the issue before us, the commonly shared presumption of Congress, the Executive Branch, and lower federal courts that tribal courts do not have the power to try non-Indians carries considerable weight. Cf. *Draper* v. *United States,* 164 U. S. 240, 245–247 (1896); *Morris* v. *Hitchcock,* 194 U. S. 384, 391–393 (1904); *Warren Trading Post Co.* v. *Arizona Tax Comm'n,* 380 U. S. 685, 690 (1965); *DeCoteau* v. *District County Court,* 420 U. S. 425, 444–445 (1975). "Indian law" draws principally upon the treaties drawn and executed by the Executive Branch and legislation passed by Congress. These instruments, which beyond their actual text form the backdrop for the intricate web of judicially made Indian law, cannot be interpreted in isolation but must be read in light of the common notions of the day and the assumptions of those who drafted them. *Ibid.*

While in isolation the Treaty of Point Elliott, 12 Stat. 927 (1855), would appear to be silent as to tribal criminal jurisdiction over non-Indians, the addition of historical perspective casts substantial doubt upon the existence of such jurisdiction.[16] In the Ninth Article, for example, the Suquamish

---

[16] When treaties with the Washington Tribes were first contemplated, the Commissioner of Indian Affairs sent instructions to the Commission to Hold Treaties with the Indian Tribes in Washington Territory and in the Blackfoot Country. Included with the instructions were copies of treaties

"acknowledge their dependence on the government of the United States." As Mr. Chief Justice Marshall explained in *Worcester* v. *Georgia*, 6 Pet. 515, 551–552, 554 (1832), such an acknowledgment is not a mere abstract recognition of the United States' sovereignty. "The Indian nations were, from their situation, necessarily dependent on [the United States] . . . for their protection from lawless and injurious intrusions into their country." *Id.*, at 555. By acknowledging their dependence on the United States, in the Treaty of Point Elliott, the Suquamish were in all probability recognizing that the United States would arrest and try non-Indian intruders who came within their Reservation. Other pro-

---

previously negotiated with the Omaha Indians, 10 Stat. 1043 (1854), and with the Ottoe and Missouria Indians, 10 Stat. 1038 (1854), which the Commissioner "regarded as exhibiting provisions proper on the part of the Government and advantages to the Indians" and which he felt would "afford valuable suggestions." The criminal provisions of the Treaty of Point Elliott are clearly patterned after the criminal provisions in these "exemplary" treaties, in most respects copying the provisions verbatim. Like the Treaty of Point Elliott, the treaties with the Omahas and with the Ottoes and Missourias did not specifically address the issue of tribal criminal jurisdiction over non-Indians.

Sometime after the receipt of these instructions, the Washington treaty Commission itself prepared and discussed a draft treaty which specifically provided that "[i]njuries committed by whites towards them [are] not to be revenged, but on complaint being made they shall be tried by the Laws of the United States and if convicted the offenders punished." For some unexplained reason, however, in negotiating a treaty with the Indians, the Commission went back to the language used in the two "exemplary" treaties sent by the Commissioner of Indian Affairs. Although respondents contend that the Commission returned to the original language because of tribal opposition to relinquishment of criminal jurisdiction over non-Indians, there is no evidence to support this view of the matter. Instead, it seems probable that the Commission preferred to use the language that had been recommended by the Office of Indian Affairs. As discussed below, the language ultimately used, wherein the Tribe acknowledged its dependence on the United States and promised to be "friendly with all citizens thereof," could well have been understood as acknowledging exclusive federal criminal jurisdiction over non-Indians.

visions of the Treaty also point to the absence of tribal jurisdiction. Thus the Tribe "agree[s] not to shelter or conceal offenders against the laws of the United States, but to deliver them up to the authorities for trial." Read in conjunction with 18 U. S. C. § 1152, which extends federal enclave law to non-Indian offenses on Indian reservations, this provision implies that the Suquamish are to promptly deliver up any non-Indian offender, rather than try and punish him themselves.[17]

By themselves, these treaty provisions would probably not be sufficient to remove criminal jurisdiction over non-Indians if the Tribe otherwise retained such jurisdiction. But an examination of our earlier precedents satisfies us that, even ignoring treaty provisions and congressional policy, Indians do not have criminal jurisdiction over non-Indians absent affirmative delegation of such power by Congress. Indian tribes do retain elements of "quasi-sovereign" authority after ceding their lands to the United States and announcing their dependence on the Federal Government. See *Cherokee Nation* v. *Georgia,* 5 Pet. 1, 15 (1831). But the tribes' retained powers are not such that they are limited only by specific restrictions in treaties or congressional enactments. As the Court of Appeals recognized, Indian tribes are prohibited from exercising both those powers of autonomous states that are expressly terminated by Congress *and* those powers *"inconsistent with their status." Oliphant* v. *Schlie,* 544 F. 2d, at 1009 (emphasis added).

Indian reservations are "a part of the territory of the United

---

[17] In interpreting Indian treaties and statutes, " '[d]oubtful expressions are to be resolved in favor of the weak and defenseless people who are the wards of the nation, dependent upon its protection and good faith.' " *McClanahan* v. *Arizona State Tax Comm'n,* 411 U. S. 164, 174 (1973), see *Kansas Indians,* 5 Wall. 737, 760 (1866); *United States* v. *Nice,* 241 U. S. 591, 599 (1916). But treaty and statutory provisions which are not clear on their face may "be clear from the surrounding circumstances and legislative history." Cf. *DeCoteau* v. *District County Court,* 420 U. S. 425, 444 (1975).

States." *United States* v. *Rogers,* 4 How. 567, 571 (1846). Indian tribes "hold and occupy [the reservations] with the assent of the United States, and under their authority." *Id.,* at 572. Upon incorporation into the territory of the United States, the Indian tribes thereby come under the territorial sovereignty of the United States and their exercise of separate power is constrained so as not to conflict with the interests of this overriding sovereignty. "[T]heir rights to complete sovereignty, as independent nations, [are] necessarily diminished." *Johnson* v. *M'Intosh,* 8 Wheat. 543, 574 (1823).

We have already described some of the inherent limitations on tribal powers that stem from their incorporation into the United States. In *Johnson* v. *M'Intosh, supra,* we noted that the Indian tribes' "power to dispose of the soil at their own will, to whomsoever they pleased," was inherently lost to the overriding sovereignty of the United States. And in *Cherokee Nation* v. *Georgia, supra,* the Chief Justice observed that since Indian tribes are "completely under the sovereignty and dominion of the United States, . . . any attempt [by foreign nations] to acquire their lands, or to form a political connexion with them, would be considered by all as an invasion of our territory, and an act of hostility." 5 Pet., at 17–18.

Nor are the intrinsic limitations on Indian tribal authority restricted to limitations on the tribes' power to transfer lands or exercise external political sovereignty. In the first case to reach this Court dealing with the status of Indian tribes, Mr. Justice Johnson in a separate concurrence summarized the nature of the limitations inherently flowing from the overriding sovereignty of the United States as follows: "[T]he restrictions upon the right of soil in the Indians, amount . . . to an exclusion of all competitors [to the United States] from their markets; and the limitation upon their sovereignty amounts *to the right of governing every person within their limits except themselves." Fletcher* v. *Peck,* 6 Cranch 87, 147 (1810) (emphasis added). Protection of territory within its

external political boundaries is, of course, as central to the sovereign interests of the United States as it is to any other sovereign nation. But from the formation of the Union and the adoption of the Bill of Rights, the United States has manifested an equally great solicitude that its citizens be protected by the United States from unwarranted intrusions on their personal liberty. The power of the United States to. try and criminally punish is an important manifestation of the power to restrict personal liberty. By submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily give up their power to try non-Indian citizens of the United States except in a manner acceptable to Congress. This principle would have been obvious a century ago when most Indian tribes were characterized by a "want of fixed laws [and] of competent tribunals of justice." H. R. Rep. No. 474, 23d Cong., 1st Sess., 18 (1834). It should be no less obvious today, even though present-day Indian tribal courts embody dramatic advances over their historical antecedents.

In *Ex parte Crow Dog,* 109 U. S. 556 (1883), the Court was faced with almost the inverse of the issue before us here— whether, prior to the passage of the Major Crimes Act, federal courts had jurisdiction to try Indians who had offended against fellow Indians on reservation land.[1] In concluding that criminal jurisdiction was exclusively in the tribe, it found particular guidance in the "nature and circumstances of the case." The United States was seeking to extend United States

> "law, by argument and inference only, . . . over aliens and strangers; over the members of a community separated by race [and] tradition, . . . from the authority and power which seeks to impose upon them the restraints of an external and unknown code . . . ; which judges them by a standard made by others and not for them . . . . It tries them, not by their peers, nor by the customs of

> their people, nor the law of their land, but by . . . a different race, according to the law of a social state of which they have an imperfect conception . . . ." *Id.,* at 571.

These considerations, applied here to the non-Indian rather than Indian offender, speak equally strongly against the validity of respondents' contention that Indian tribes, although fully subordinated to the sovereignty of the United States, retain the power to try non-Indians according to their own customs and procedure.

As previously noted, Congress extended the jurisdiction of federal courts, in the Trade and Intercourse Act of 1790, to offenses committed by non-Indians against Indians within Indian Country. In doing so, Congress was careful to extend to the non-Indian offender the basic criminal rights that would attach in non-Indian related cases. Under respondents' theory, however, Indian tribes would have been free to try the same non-Indians without these careful proceedings unless Congress affirmatively legislated to the contrary. Such an exercise of jurisdiction over non-Indian citizens of the United States would belie the tribes' forfeiture of full sovereignty in return for the protection of the United States.

In summary, respondents' position ignores that

> "Indians are within the geographical limits of the United States. The soil and people within these limits are under the political control of the Government of the United States, or of the States of the Union. There exist in the broad domain of sovereignty but these two. There may be cities, counties, and other organized bodies with limited legislative functions, but they . . . exist in subordination to one or the other of these." *United States* v. *Kagama,* 118 U. S. 375, 379 (1886).

We recognize that some Indian tribal court systems have become increasingly sophisticated and resemble in many

respects their state counterparts. We also acknowledge that with the passage of the Indian Civil Rights Act of 1968, which extends certain basic procedural rights to *anyone* tried in Indian tribal court, many of the dangers that might have accompanied the exercise by tribal courts of criminal jurisdiction over non-Indians only a few decades ago have disappeared. Finally, we are not unaware of the prevalence of non-Indian crime on today's reservations which the tribes forcefully argue requires the ability to try non-Indians.[18] But these are considerations for Congress to weigh in deciding whether Indian tribes should finally be authorized to try non-Indians. They have little relevance to the principles which lead us to conclude that Indian tribes do not have inherent jurisdiction to try and to punish non-Indians. The judgments below are therefore

*Reversed.*

MR. JUSTICE BRENNAN took no part in the consideration or decision of these cases.

MR. JUSTICE MARSHALL, with whom THE CHIEF JUSTICE joins, dissenting.

I agree with the court below that the "power to preserve order on the reservation . . . is a sine qua non of the sovereignty that the Suquamish originally possessed." *Oliphant* v. *Schlie,* 544 F. 2d 1007, 1009 (CA9 1976). In the absence of affirmative withdrawal by treaty or statute, I am of the view that Indian tribes enjoy as a necessary aspect of their retained sovereignty the right to try and punish all persons who commit offenses against tribal law within the reservation. Accordingly, I dissent.

---

[18] See 4 National American Indian Court Judges Assn., Justice and the American Indian 51–52 (1974); Hearings on S. 1 and S. 1400 (reform of the Federal Criminal Laws) before the Subcommittee on Criminal Laws and Procedures of the Senate Committee on the Judiciary, 93d Cong., 1st Sess., 6469 *et seq.* (1973).