Justice THOMAS,
concurring in the judgment.
As this case should make clear, the time has come to reexamine the premises and logic of our tribal sovereignty cases. It seems to me that much of the confusion *1642 reflected |21⅞⅛ our precedent arises from two largely incompatible and doubtful assumptions. First, Congress (rather than some other part of the Federal Government) can regulate virtually every aspect of the tribes without rendering tribal sovereignty a nullity. See, e.g., United States v. Wheeler, 435 U.S. 313, 319, 98 S.Ct. 1079, 55 L.Ed.2d 303 (1978). Second, the Indian tribes retain inherent sovereignty to enforce their criminal laws against their own members. See, e.g., id., at 326, 98 S.Ct. 1079. These assumptions, which I must accept as the case comes to us, dictate the outcome in this case, and I therefore concur in the judgment.
I write separately principally because the Court fails to confront these tensions, a result that flows from the Court’s inadequate constitutional analysis. I cannot agree with the Court, for instance, that the Constitution grants to Congress plenary power to calibrate the “metes and bounds of tribal sovereignty.” Ante, at 1635; see also ante, at 1639 (holding that “the Constitution authorizes Congress” to regulate tribal sovereignty). Unlike the Court, ante, at 1633,1 cannot locate such congressional authority in the Treaty Clause, U.S. Const., Art. II, § 2, cl. 2, or the Indian Commerce Clause, Art. I, § 8, cl. 3. Additionally, I would ascribe much more significance to legislation such as the Act of Mar. 3, 1871, Rev. Stat. § 2079, 16 Stat. 566, codified at 25 U.S.C. § 71, that purports to terminate the practice of dealing with Indian tribes by treaty. The making of treaties, after all, is the one mechanism that the Constitution clearly provides for the Federal Government to interact with sovereigns other than the States. Yet, if I accept that Congress does have this authority, I believe that the result in Wheeler is questionable. In my view, the tribes either are or are not separate sovereigns, and our federal Indian law eases untenably hold both positions simultaneously.
I
In response to the Court’s decision in Duro v. Reina, 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990) (holding that the tribes lack inherent authoijit^ie to prosecute nonmember Indians), Congress amended the Indian Civil Rights Act of 1968 (ICRA). Specifically, through this tLDuro fix,” Congress amended ICRA’s definition of the tribes’ “powers of self-government” to “recogniz[e] and affir[m]” the existence of “inherent power ... to exercise criminal jurisdiction over all Indians.” 25 U.S.C. § 1301(2). There is quite simply no way to interpret a recognition and affirmation of inherent power as a delegation of federal power, as the Court explains. Ante, at 1632-1633. Delegated power is the very antithesis of inherent power.
But even if the statute were less clear, I would not interpret it as a delegation of federal power. The power to bring federal prosecutions, which is part of the putative delegated power, is manifestly and quintessentially executive power. Morrison v. Olson, 487 U.S. 654, 691, 108 S.Ct. 2597, 101 L.Ed.2d 569 (1988); id., at 705, 108 S.Ct. 2597 (SCALIA, J., dissenting). Congress cannot transfer federal executive power to individuals who are beyond “meaningful Presidential control.” Printz v. United States, 521 U.S. 898, 922-923, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997). And this means that, at a minimum, the President must have some measure of “the power to appoint and remove” those exercising that power. Id., at 922, 117 S.Ct. 2365; see also Morrison, supra, at 706-715, 108 S.Ct. 2597 (SCALIA, J., dissenting).
It does not appear that the President has any control over tribal officials, let *1643 alone a substantial measure of the appointment and removal power. Cf. Brief for National Congress of American Indians as Amicus Curiae 27-29. Thus, at least until we are prepared to recognize absolutely independent agencies entirely outside of the Executive Branch with the power to bind the Executive Branch (for a tribal prosecution would then bar a subsequent federal prosecution), the tribes cannot be analogized to administrative agencies, as the dissent suggests, post, at 1649 (opinion of SOUTER, J.). That is, reading the “Duro fix” as a delegation of federal power (without also divining some adequate method of Presidential control) would create grave constitutional difficulties. Cf. INS v. St. Cyr, 533 U.S. 289, 299-300, 121 S.Ct. 2271, 150 L.Ed.2d 347 (2001); Solid Waste Agency of Northern Cook Cty. v. Army Corps of Engineers, 531 U.S. 159, 173, 121 S.Ct. 675, 148 L.Ed.2d 576 (2001). Accordingly, the Court has only two options: Either the “Duro fix” changed the result in Duro or it did nothing at all.[1]
II
In Wheeler, 435 U.S, at 322-323, 98 S.Ct. 1079, the Court explained that, prior to colonization, “the tribes were self-governing sovereign political communities.” The Court acknowledged, however, that, after “[tjheir incorporation within the territory of the United States,” the tribes could exereise their inherent sovereignty only as consistent with federal policy embodied in treaties, statutes, and Executive Orders. Id., at 323, 98 S.Ct. 1079; see also id., at 327-328, 98 S.Ct. 1079. Examining these sources for potential conflict, the Court concluded that the tribes retained the ability to exercise their inherent sovereignty to punish their own members. Id., at 323-330, 98 S.Ct. 1079.
Although Wheeler seems to be a sensible example of federal common lawmaking, I am not convinced that it was correctly decided. To be sure, it makes sense to conceptualize |.¿18the tribes as sovereigns that, due to their unique situation, cannot exercise the full measure of their sovereign powers. Wheeler, at times, seems to analyze the problem in just this way. See, e.g., id,., at 323-326, 98 S.Ct. 1079; id., at 323, 98 S.Ct. 1079 (relying on Oliphant v. Suquamish Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), discussed infra).
But I do not see how this is consistent with the apparently “undisputed fact that Congress has plenary authority to legislate for the Indian tribes in all matters, including their form of government.” 435 U.S., at 319, 98 S.Ct. 1079. The sovereign is, by definition, the entity “in which independent *1644 and supreme authority is vested.” Black’s Law Dictionary 1395 (6th ed.1990). It is quite arguably the essence of sovereignty not to exist merely at the whim of an external government.
Further, federal policy itself could be thought to be inconsistent with this residual-sovereignty theory. In 1871, Congress enacted a statute that purported to prohibit entering into treaties with the “Indian nation[s] or tribe[s].” 16 Stat. 566, codified at 25 U.S.C. § 71. Although this Act is constitutionally suspect (the Constitution vests in the President both the power to make treaties, Art. II, § 2, cl. 2, and to recognize foreign governments, Art. II, § 3; see, e.g., United States v. Pink, 315 U.S. 203, 228-230, 62 S.Ct. 552, 86 L.Ed. 796 (1942)), it nevertheless reflects the view of the political branches that the tribes had become a purely domestic matter.
To be sure, this does not quite suffice to demonstrate that the tribes had lost their sovereignty. After all, States retain sovereignty despite the fact that Congress can regulate States qua States in certain limited circumstances. See, e.g., Katzenbach v. Morgan, 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); cf. New York v. United States, 505 U.S. 144, 160-161, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992); Garcia v. San Antonio Metropolitan Transit Authority, 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). But the States (unlike the tribes) are part of a constitutional framework that allocates sovereignty between the State and Federal Governments and specifically grants Congress authority to legislate with respect to them, see 1219U.S. Const., Amdt. 14, § 5. And even so, we have explained that “the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States.” New York, 505 U.S., at 166, 112 S.Ct. 2408; id., at 162-166, 112 S.Ct. 2408; see also Prints, 521 U.S., at 910-915, 117 S.Ct. 2365.
The tribes, by contrast, are not part of this constitutional order, and their sovereignty is not guaranteed by it. As Chief Justice Marshall explained:
“[T]he relation of the Indians to the United States is marked by peculiar and cardinal distinctions which exist no where else ....
“[Y]et it may well be doubted whether those tribes which reside within the acknowledged boundaries of the United States can, with strict accuracy, be denominated foreign nations. They may, more correctly, perhaps, be denominated domestic dependent nations.” Cherokee Nation v. Georgia, 5 Pet. 1, 16-17, 8 L.Ed. 25 (1831).
Chief Justice Marshall further described the tribes as “independent political communities, retaining their original natural rights,” and specifically noted that the tribes possessed the power to “mak[e] treaties.” Worcester v. Georgia, 6 Pet. 515, 559, 8 L.Ed. 483 (1832). Although the tribes never fit comfortably within the category of foreign nations, the 1871 Act tends to show that the political branches no longer considered the tribes to be anything like foreign nations. And it is at least arguable that the United States no longer considered the tribes to be sovereigns.[2] Federal Indian policy is, to say the least, schizophrenic. And this confusion *1645 continues to infuse federal Indian law and our cases.
|.^Nevertheless, if I accept Wheeler, I also must accept that the tribes do retain inherent sovereignty (at least to enforce their criminal laws against their own members) and the logical consequences of this fact. In Heath v. Alabama, 474 U.S. 82, 88, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985), the Court elaborated the dual sovereignty doctrine and explained that a single act that violates the “ ‘peace and dignity* of two sovereigns by breaking the laws of each” constitutes two separate offenses. This, of course, is the reason that the Double Jeopardy Clause does not bar successive prosecutions by separate sovereigns. But whether an act violates the “peace and dignity” of a sovereign depends not in the least on whether the perpetrator is a member (in the case of the tribes) or a citizen (in the ease of the States and the Nation) of the sovereign.
Heath also instructs, relying on Wheeler, that the separate-sovereign inquiry “turns on whether the two entities draw their authority to punish the offender from distinct sources of power.” Heath, supra, at 88, 106 S.Ct. 433. But Wheeler makes clear that the tribes and the Federal Government do draw their authority to punish from distinct sources and that they are separate sovereigns. Otherwise, the subsequent federal prosecution in Wheeler would have violated the Double Jeopardy Clause.[3] It follows from our case law that Indian tribes possess inherent sovereignty to punish anyone who violates their laws.
In Duro v. Reina, 495 U.S. 676, 110 S.Ct. 2053, 109 L.Ed.2d 693 (1990), the Court held that the Indian tribes could no longer enforce them criminal laws against nonmember Indians. Despite the obvious tension, Duro and Wheeler are not necessarily inconsistent. Although Wheeler and Heath, taken together, necessarily imply that the tribes retain inherent sovereignty to try anyone who violates their criminal laws, Wheeler and Duro make |¾>, clear that conflict with federal policy can operate to prohibit the exercise of this sovereignty. Duro, then, is not a case about “inherent sovereignty” (a term that we have used too imprecisely); rather, it is a case about whether a specific exercise of tribal sovereignty conflicts with federal policy.
Indeed, the Court in Duro relied primarily on Oliphant v. Suquamish Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), which held that tribes could not enforce their criminal laws against non-Indians. In reaching that conclusion, the Court in Oliphant carefully examined the views of Congress and the Executive Branch. Id., at 197-206, 98 S.Ct. 1011 (discussing treaties, statutes, and views of the Executive Branch); id., at 199, 98 S.Ct. 1011 (discussing Attorney General opinions, including 2 Op. Atty. Gen. 693 (1834) (concluding that tribal exercise of criminal jurisdiction over non-Indians was inconsistent with various treaties)). Duro at least rehearsed the same analysis. 495 U.S., at 688-692, 110 S.Ct. 2053. Thus, although Duro is sprinkled with references to various constitutional concerns, see, e.g., id., at 693-694, 110 S.Ct, 2053, Duro, Oliphant, and Wheeler are classic federal-common-law decisions. See also County of Oneida v. Oneida. Indian Nation of N. Y., 470 U.S. 226, 233-236, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985).
I acknowledge that our cases have distinguished between “tribal power [that] is necessary to protect tribal self-govern *1646 ment or to control internal relations” and tribal power as it relates to the external world. Montana v. United States, 450 U.S. 544, 564, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981); see also Nevada v. Hicks, 533 U.S. 353, 358-359, 121 S.Ct. 2304, 150 L.Ed.2d 398 (2001); South Dakota v. Bourland, 508 U.S. 679, 695, n. 15, 113 S.Ct. 2309, 124 L.Ed.2d 606 (1993); Duro, supra, at 685-686, 110 S.Ct. 2053; Wheeler, 435 U.S., at 322-325, 98 S.Ct. 1079. This distinction makes perfect sense as a matter of federal common law: Purely “internal” matters are by definition unlikely to implicate any federal policy. But, critically, our cases have never drawn this line as a constitutional matter. That is why we have analyzed extant federal law (embodied in treaties, statutes, and Executive Orders) before concluding that particular tribal assertions of power were incompatible with the position of the tribes. See, e.g., National Farmers Union Ins. Cos. v. Crow Tribe, 471 U.S. 845, 853-854, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985); Oliphant, supra, at 204, 98 S.Ct. 1011 (“While Congress never expressly forbade Indian tribes to impose criminal penalties on non-Indians, we now make express our implicit conclusion of nearly a century ago [referring to In re Mayfield, 141 U.S. 107, 11 S.Ct. 939, 35 L.Ed. 635 (1891) ] that Congress consistently believed this to be the necessary result of its repeated legislative actions”).[4]
As noted, in response to Duro, Congress amended ICRA. Specifically, Congress “recognized and affirmed” the existence of “inherent power ... to exercise criminal jurisdiction over all Indians.” 25 U.S.C. § 1301(2). President Bush signed this legislation into law. See 27 Weekly Comp, of Pres. Doc. 1573-1574 (1991). Further, as this litigation demonstrates, it is the position of the Executive Branch that the tribes possess inherent authority to prosecute nonmember Indians.
In my view, these authoritative pronouncements of the political branches make clear that the exercise of this aspect of sovereignty is not inconsistent with federal policy and therefore with the position of the tribes. Thus, while Duro may have been a correct federal-common-law decision at the time, the political branches have subsequently made clear that the Diatribes’ exercise of criminal jurisdiction against nonmember Indians is consistent with federal policy. The potential conflicts on which Duro must have been premised, according to the political branches, do not exist. See also ante, at 1636. I therefore agree that, as the case comes to us, the tribe acted as a separate sovereign when it prosecuted respondent. Accordingly, the Double Jeopardy Clause does not bar the subsequent federal prosecution.
Ill
I believe that we must examine more critically our tribal sovereignty case law. *1647 Both the Court and the dissent, however, compound the confusion by failing to undertake the necessary rigorous constitutional analysis. I would begin by carefully following our assumptions to their logical conclusions and by identifying the potential sources of federal power to modify tribal sovereignty.
The dissent admits that “[t]reaties and statutes delineating the tribal-federal relationship are properly viewed as an independent elaboration by the political branches of the fine details of the tribes’ dependent position, which strips the tribes of any power to exercise criminal jurisdiction over those outside their own memberships.” Post, at 1650. To the extent that this is a description of the federal-common-law process, I agree. But I do not understand how the dissent can then conclude that “the jurisdictional implications [arising from this analysis are] constitutional in nature.” Ibid, By this I understand the dissent to mean that Congress cannot alter the result, though the dissent never quite says so.
The analysis obviously has constitutional implications. It is, for example, dispositive of respondent’s double jeopardy claim. But it does not follow that this Court’s federal-common-law decisions limiting tribes’ authority to exercise their inherent sovereignty somehow become enshrined as constitutional holdings that the political branches cannot | palter. When the political branches demonstrate that a particular exercise of the tribes’ sovereign power is in fact consistent with federal policy, the underpinnings of a federal-common-law decision disabling the exercise of that tribal power disappear. Although I do not necessarily agree that the tribes have any residual inherent sovereignty or that Congress is the constitutionally appropriate branch to make adjustments to sovereignty, see Part II, supra, it is important to recognize the logical implications of these assumptions.
Similarly unavailing is the dissent’s observation that when we perform the separate-sovereign analysis “we are undertaking a constitutional analysis based on legal categories of constitutional dimension.” Post, at 1650. The dissent concludes from this that our double jeopardy analysis in this context “must itself have had constitutional status.” Ibid. This ipse dixit does not transform our common-law decisions into constitutional holdings. Cf. Dickerson v. United States, 530 U.S. 428, 459-461, 120 S.Ct. 2326, 147 L.Ed.2d 405 (2000) (SCALIA, J., dissenting).
I do, however, agree that this case raises important constitutional questions that the Court does not begin to answer. The Court utterly fails to find any provision of the Constitution that gives Congress enumerated power to alter tribal sovereignty. The Court cites the Indian Commerce Clause and the treaty power. Ante, at 1633. I cannot agree that the Indian Commerce Clause “ provide[s] Congress with plenary power to legislate in the field of Indian affairs.’ ” Ibid, (quoting Cotton Petroleum Corp. v. New Mexico, 490 U.S. 163, 192, 109 S.Ct. 1698, 104 L.Ed.2d 209 (1989)). At one time, the implausibility of this assertion at least troubled the Court, see, e.g., United States v. Kagama, 118 U.S. 375, 378-379, 6 S.Ct. 1109, 30 L.Ed. 228 (1886) (considering such a construction of the Indian Commerce Clause to be “very strained”), and I would be willing to revisit the question. Cf., e.g., United States v. Morrison, 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000); United States v. Lopez, 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995); id., at 584-593, 115 S.Ct. 1624 (THOMAS, J., concurring).
_J_226Next, the Court acknowledges that “[t]he treaty power does not literally au *1648 thorize Congress to aet legislatively, for it is an Article II power authorizing the President, not Congress, ‘to make Treaties.’ ” Ante, at 1633 (quoting U.S. Const., Art. II, § 2, cl. 2). This, of course, suffices to show that it provides no power to Congress, at least in the absence of a specific treaty. Cf. Missouri v. Holland, 252 U.S. 416, 40 S.Ct. 382, 64 L.Ed. 641 (1920). The treaty power does not, as the Court seems to believe, provide Congress with free-floating power to legislate as it sees fit on topics that could potentially implicate some unspecified treaty. Such an assertion is especially ironic in light of Congress’ enacted prohibition on Indian treaties.
In the end, the Court resorts to citing past examples of congressional assertions of this or similar power. Ante, at 1634-1635. At times, such history might suffice. Cf. Dames & Moore v. Regan, 453 U.S. 654, 686, 101 S.Ct. 2972, 69 L.Ed.2d 918 (1981); Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 610-611, 72 S.Ct. 863, 96 L.Ed. 1153 (1952) (Frankfurter, J., concurring). But it does not suffice here for at least two reasons. First, federal Indian law is at odds with itself. I find it difficult to reconcile the result in Wheeler uith Congress’ 1871 prospective prohibition on the making of treaties with the Indian tribes. The Federal Government cannot simultaneously claim power to regulate virtually every aspect of the tribes through ordinary domestic legislation and also maintain that the tribes possess anything resembling “sovereignty.” See Part II, supra. In short, the history points in both directions.
Second, much of the practice that the Court cites does not actually help its argument. The “Insular Cases,” which include the Hawaii and Puerto Rico examples, ante, at 1635, involved Territories of the United States, over which Congress has plenary power to govern and regulate. See Reid v. Covert, 354 U.S. 1, 13, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957); U.S. Const, Art. IV, § 3, el. 2. The existence of a textual source for congressional power distinguishes these cases. And, incidentally, ajthoughae one might think that Congress’ authority over the tribes could be found in Article IV, § 3, cl. 2, the Court has held that the Territories are the United States for double jeopardy purposes, see, e.g., Wheeler, 435 U.S., at 321-322, 98 S.Ct. 1079; Puerto Rico v. Shell Co. (P. R.), Ltd., 302 U.S. 253, 264-266, 58 S.Ct. 167, 82 L.Ed. 235 (1937), which would preclude the result in Wheeler. It is for this reason as well that the degree of autonomy of Puerto Rico is beside the point. See Wheeler, supra, at 321, 98 S.Ct. 1079; post, at 1650.
The Court should admit that it has failed in its quest to find a source of congressional power to adjust tribal sovereignty. Such an acknowledgment might allow the Court to ask the logically antecedent question whether Congress (as opposed to the President) has this power. A cogent answer would serve as the foundation for the analysis of the sovereignty issues posed by this case. We might find that the Federal Government cannot regulate the tribes through ordinary domestic legislation and simultaneously maintain that the tribes are sovereigns in any meaningful sense. But until we begin to analyze these questions honestly and rigorously, the confusion that I have identified will continue to haunt our cases.

. I am sympathetic to Justice KENNEDY'S position that we need not resolve the question presented. Ante, at 1640 (opinion concurring in judgment). If Congress has power to restore tribal authority to prosecute nonmember Indians, respondent's tribal prosecution was the legitimate exercise of a separate sovereign. As such, under the dual sovereignty doctrine, it does not bar his subsequent federal prosecution. On the other hand, if the amendment to ICRA had no effect (the only other possibility), jeopardy did not attach in the tribal prosecution. See, e.g, Serfass v. United States, 420 U.S. 377, 391, 95 S.Ct. 1055, 43 L.Ed.2d 265 (1975); Grafton v. United States, 206 U.S. 333, 345, 27 S.Ct. 749, 51 L.Ed. 1084 (1907) (noting "that before a person can be said to have been put in jeopardy of life or limb the court in which he was acquitted or convicted must have had jurisdiction to try him for the offense charged"); United States v. Phelps, 168 F.3d 1048, 1053-1054 (C.A.8 1999) (holding tribal court prosecution without jurisdiction did not bar subsequent federal prosecution). Jeopardy could have attached in the tribal prosecution for federal purposes only if the Federal Government had authorized the prosecution. But Congress did not authorize tribal prosecutions, and nothing suggests that the Executive Branch prompted respondent’s tribal prosecution.

. Additionally, the very enactment of ICRA through normal legislation conflicts with the notion that tribes possess inherent sovereignty. Title 25 U.S.C. § 1302, for example, requires tribes “in exercising powers of self-government'' to accord individuals most of the protections in the Bill of Rights. I doubt whether Congress could, through ordinary legislation, require States (let alone foreign nations) to use grand juries.

. I acknowledge that Wheeler focused specifically on the tribes’ authority to try their own members. See 435 U.S., at 323-330, 98 S.Ct. 1079. But, as I discuss below, the distinction between the tribes' external and internal powers is not constitutionally required.

. Justice SOUTER believes that I have overlooked Oliphant's reliance on sources other than “treaties, statutes, and the views of the Executive Branch.” Post, at 1651, n. 2. Justice SOUTER quotes the following passage from Oliphant: "[E]ven ignoring treaty provisions and congressional policy, Indians do not have criminal jurisdiction over non-Indians absent affirmative delegation of such power by Congress.... Indian tribes are prohibited from exercising both those powers of autonomous states that are expressly terminated by Congress and those powers inconsistent with their status.” 435 U.S., at 208, 98 S-Ct. 1011 (emphasis added; internal quotation marks and citation omitted). The second quoted sentence is entirely consistent with federal common lawmaking and is difficult to understand as anything else. I. admit that the first sentence, which removes from consideration most of the sources of federal common law, makes the second sentence puzzling. But this is precisely the confusion that I have identified and that I hope the Court begins to resolve.