### Cato Sells, et al., Appellants,
### v.
### Louis Espil, et al., Appellees.
### Decided August 14, 1990

## OPINION

Before TSO, Chief Justice, AUSTIN and BLUEHOUSE, Associate Justices.

Martha Blue, Esq., Flagstaff, Arizona, and Daniel Cracchiolo, Esq., Phoenix, Arizona, for the Appellants; and James Jay Mason, Esq., Gallup, New Mexico, and Patricia Finley, Esq., Phoenix, Arizona, for the Appellees.

Opinion delivered by AUSTIN, Associate Justice.

This appeal arose from a suit on an alleged oral agreement for brokerage services in the sale of land to the Navajo Nation. None of the parties are residents of the Navajo Nation and only one is a member of the Navajo Tribe. The facts will be reviewed *de novo* with disputed facts resolved in appellants' favor. The issue is whether the Window Rock District Court has personal jurisdiction over the defendants.

## I. Facts

The events giving rise to this case began in early 1985. At that time, defendants Louis and Peter Espil (Espils) were the sole shareholders in the Espil Sheep Company, an Arizona corporation. The Company owned the Peaks Ranch, located near the San Francisco Peaks and north of Flagstaff, Arizona. The Ranch is entirely outside the boundaries of the Navajo Nation.

Prior to this time, the Espils had decided to sell the Ranch. They had made an offer to the Navajo Nation, but received no response.

Plaintiff Warren Pyle offered to introduce the Espils to Pyle's friend, Cato Sells. Plaintiff Sells, a member of the Navajo Tribe, had held various positions in the Navajo government and still had contacts there. Pyle proposed to the Espils that he and Sells act as consultants on the sale of the Ranch to the Navajo Nation, in return for a fee. None of the parties were residents of the Navajo Nation. All but Sells were non-Indian.

On February 13, 1985, Pyle and Louis Espil met with Sells at his home in Farmington, New Mexico. Sells wanted time to investigate the possibility of the

sale before agreeing to help the Espils. He was particularly interested in gauging local reaction to the water rights that came with the Ranch and in the fact that it comprised an area sacred to the Navajo people. With money given to him by Louis Espil, Sells traveled to the vicinity of Tuba City, Arizona, on the Navajo Nation, and talked to local officials regarding the purchase of the Peaks Ranch by the Tribe. He received a favorable response.

On March 7, 1985, Pyle brought Louis Espil to Sells' home in Farmington, New Mexico. The three discussed the sale of the Ranch to the Navajo Nation and the alleged brokerage agreement, continuing their conversation during a drive through the Navajo Agricultural Products Industry (NAPI) land in the Eastern Navajo Agency. NAPI is located on Navajo tribal trust land and within the boundaries of the Navajo Nation. By the conclusion of the meeting, Pyle and Sells had agreed to facilitate the sale of the Peaks Ranch, in exchange for $600,000.00 if the Navajo Nation purchased it. The trial court found that the place of formation of this alleged oral agreement was outside the Navajo Nation.

Sells and Pyle were not licensed real estate brokers and apparently did not represent themselves as such. Their alleged oral agreement was never reduced to writing.

Thereafter, there were three meetings related to the Ranch sale between Louis Espil and officials of the Navajo government. Sells arranged the first two meetings, and was present at the first. Pyle attended all three meetings, which all took place on the Navajo Reservation in the offices of the Navajo Nation in Window Rock, Arizona.

In February 1986, Louis Espil decided to sell the Peaks Ranch to another party. When Pyle discovered this, he immediately contacted Peter Espil and arranged a meeting with then Tribal Chairman Peterson Zah. At the meeting, Peter Espil verbally agreed to sell the Peaks Ranch to the Navajo Nation. When Louis Espil found out about the meeting and the verbal agreement, he became angry and "fired" Pyle.

Between the two Espil brothers, they made four trips to the Navajo Nation to negotiate the land sale, one tour of NAPI land during discussions of the Ranch sale and negotiations of the brokerage agreement, and various telephone calls to tribal officials. Pyle and Sells each made several trips to the Navajo Nation and elsewhere to facilitate the sale.

On August 6, 1986, the Navajo Nation bought the Peaks Ranch for over $6,000,000.00. The closing took place at the Ranch and in Flagstaff, Arizona. Sells and Pyle commenced this action after the Espils refused to pay them for their services under the alleged oral brokerage agreement. The Window Rock District Court dismissed the case for lack of personal jurisdiction over the Espils, and Sells and Pyle appealed.

## II. Discussion

The court below granted the defendants' motion for summary judgment based on lack of personal jurisdiction. Summary judgment constitutes a decision on the merits. Instead of granting summary judgment, the court should have simply dismissed the suit for lack of personal jurisdiction. We will treat this appeal as if a motion to dismiss had been filed and granted below.

The trial court found that although Sells and Pyle called their agreement with the Espils a "consulting agreement," it was actually a brokerage agreement for the sale of real estate. The court also ruled that neither the Espils' trips to the Navajo Nation to negotiate the sale to the Tribe, nor the actions of Sells and Pyle as the Espils' employees, counted as the Espils' minimum contacts for jurisdictional purposes.

This Court agrees with the Window Rock District Court's characterization of the alleged agreement as a brokerage contract, but disagrees with the trial court's decision that there is no jurisdiction over the defendants.

To determine whether it has personal jurisdiction over a non-resident defendant, a Navajo Nation court must find that the Navajo jurisdictional statute authorizes the assertion, and jurisdiction must not violate the defendant's right to due process under the Navajo Nation Bill of Rights and the Indian Civil Rights Act. *Billie v. Abbott*, 6 Nav. R 66, 73-74 (1988).

### A. Statutory Authorization

The relevant statute grants Navajo district courts jurisdiction over "... all civil actions in which the defendant is a resident of Navajo Indian Country, or has caused an action to occur within the territorial jurisdiction of the Navajo Nation." 7 N.T.C. § 253 (1985). We hold that this statute authorizes personal jurisdiction over non-resident defendants to the extent allowed by Navajo due process.

Support for this interpretation is found in the resolution accompanying the statute. In the resolution, the Navajo Tribal Council alludes to the United States Supreme Court's decision curtailing tribal criminal jurisdiction in *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191 (1978). Faced with the Supreme Court's ruling that tribal courts could no longer exercise criminal jurisdiction over non-Indian defendants, the Tribal Council expressed the need to expand civil jurisdiction to include non-Indians. Navajo Tribal Council Res. CF-19-90 (February 13, 1980). Thus, Navajo courts exercising civil jurisdiction to the permissible limits is in accord with the Tribal Council's intent. Arizona courts have also construed that state's jurisdictional statute, which is very similar to the Navajo Nation statute, consistent with exercising jurisdiction to the limits of due process. *Phillips v. Anchor Hocking Glass Corp.*, 100 Ariz. 251, 413 P.2d 732 (1966).

## B. Due Process

The standard of due process must be taken from Navajo case law because it alone interprets due process under the Navajo Nation Bill of Rights, 1 N.T.C. § 3 (1986 amendment), Navajo Tribal Council Res. CD-59-86 (December 11, 1986), and the Indian Civil Rights Act, 25 U.S.C. § 1302(8) (1968).

*Billie v. Abbott*, 6 Nav. R. at 73-74, is the premier case interpreting due process under the Navajo Nation Bill of Rights and the ICRA.[1] In *Billie*, the Court used a minimum contacts test to determine whether due process was satisfied in the assertion of jurisdiction over a Utah state official. The official had caused withholding of federal tax refund checks from Navajos residing in the Navajo Nation. The Court ruled that Navajo courts have exclusive jurisdiction over the domestic relations of Navajos living on the reservation, and because the Utah official had used state law to determine the amount of child support owed by Navajo plaintiffs, the plaintiffs were denied their right to have these determinations made in Navajo courts. Causing this injury to occur within the Navajo Nation was enough of a contact to satisfy due process. *Id.*

In this case, the cause of action may have accrued outside the boundaries of the Navajo Nation. However, nothing in Navajo case law says that the place of injury is the only factor to be considered in determining minimum contacts. In *Phillips v. Anchor Hocking Glass Corp.*, the court cited language saying that state courts may exercise jurisdiction "... over a foreign corporation doing business within the state, even though the cause of action arose elsewhere." 100 Ariz. 251, 413 P.2d 732, 734, (quoting Scott, *Hanson v. Denckla*, 72 Ham. L. Rev. 695, 702 (1958)) .

The trial court based its decision of lack of minimum contacts on its finding that the alleged oral brokerage agreement was not formed in the Navajo Nation. We believe that this is too narrow an interpretation of Navajo due process.

In the Navajo Nation, the contacts of a defendant shall be evaluated on a case-by-case basis within the following guidelines. All of a defendant's forum-related activity shall count as minimum contacts; however, the greater the connection between the cause of action and the activities, the less substantial shall be the necessary contacts. Where the plaintiff's cause of action is totally unrelated to a defendant's contacts with the Navajo Nation, substantial contacts will be necessary for the assertion of jurisdiction.[2] Where there is a reasonable relationship

---

1. Both parties relied on *Thompson v. Wayne Lovelady's Frontier Ford*, 1 Nav. R. 282 (1978), which interpreted due process under the United States Constitution. Almost a century ago, the United States Supreme Court held that the United States Constitution did not apply to Indian tribes. *Talton v. Mayes*, 163 U.S. 376 (1896). Thus, the authority cited in the briefs is not binding on this Court and will be used for analogy only.

2. An example of a suit on a claim unrelated to the defendant's cause of action is *Perkins v. Benquet Consolidated Mining Co.*, 342 U.S. 437 (1952). *Perkins* was a personal injury action brought in Ohio court against a Phillipines corporation. The corporation's contacts were that its president maintained an office in Ohio, paid salaries, transferred stock and conducted other corporate activities within the state. The Supreme Court allowed Ohio's jurisdiction over the corporation on the unrelated personal injury action because of the magnitude of the corporation's contacts. *Perkins*, 342 U.S. at 448.

between the cause of action and the defendant's contacts, jurisdiction will be appropriate with less substantial contacts.[3]

Louis Espil made three trips to the Navajo Nation government offices in Window Rock, and Peter Espil made one; either Sells or Pyle, the Espils' alleged employees, were present at all of these meetings. Thus, while it is technically true that the Espils' contacts with the Navajo Nation were not in pursuit of the alleged oral brokerage agreement at issue in this case, we hold that the contacts and cause of action are reasonably related. Further, given this close connection between the cause of action and the Espils' contacts, the contacts are substantial enough to satisfy due process. Through their actions in making the alleged agreement with Pyle and Sells, and in coming to Window Rock to negotiate the land sale, the Espils should have "reasonably anticipate[d] being haled into" the Navajo courts to adjudicate a dispute on either the alleged brokerage agreement or the sale of land to the Navajo Nation. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985), (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

Navajo due process must be interpreted in a way that is beneficial to the Navajo Nation. *Billie*, 6 Nav. R. at 74. Contrary to the Espils' assertions, the Navajo Nation does have an interest in adjudicating this dispute. First, one party is a Navajo. While not a resident of the Navajo Nation, Sells is an enrolled member of the tribe, which gives the tribe a governmental interest in providing legal relief for him. Second, part of the negotiations of the alleged oral brokerage agreement took place on Navajo Agricultural Products Industry land, which is tribal trust land. Most compelling, the Espils allegedly engaged the services of Pyle and Sells, directing them to come to the Navajo Nation on the Espils' behalf. We stop short of holding that the actions of Sells and Pyle in the Navajo Nation should be counted as the Espils' minimum contacts absent the trial court's finding of an agency relationship. However, the alleged act of contracting with a party for the sole purpose of gaining access to the government of the Navajo Nation is a strong contact with the Navajo Nation. Finally, the Navajo courts do not discriminate among parties litigating before them. Navajo courts are open to anyone who find it convenient to litigate here. In the process of litigation, Navajo law and Navajo sovereignty are strengthened.

Requiring the Espils to defend in a Navajo Nation court would not be unfair or unduly inconvenient. As the court in *Mendelson v. Fleischchmann*, 386 F. Supp. 436, 439 (So. Dist. N.Y. 1973), said in asserting jurisdiction in a similar case, "[d]efendants did not find [the forum] too inconvenient ... when they wanted to ... advance their business interests." The Espils were able to travel from Litchfield Park near Phoenix, Arizona, to Window Rock, Navajo Nation, and

---

3. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985), provides an example of the assertion of jurisdiction on a related claim. In that case, Burger King, a Florida corporation sued its Michigan franchisee in Florida courts. The defendant's contacts were that it had signed a contract with Burger King, and made payments to the Florida office. The Supreme Court held that in a suit on the franchise contract, this constituted "purposeful availment" of the Florida forum.

Farmington, New Mexico to negotiate the land sale contract and the alleged oral brokerage agreement; surely, they can travel to the Navajo Nation again to adjudicate a dispute on the latter.

## III. Decision

We hold that the Window Rock District Court has personal jurisdiction over the Espils to adjudicate the action on the alleged oral brokerage agreement. We therefore reverse the ruling below and remand for a determination of the case on the merits.

Our holding does not determine the merits of whether the alleged contract actually existed. The determination that the Navajo court has jurisdiction also has no bearing on choice of law matters.