**UNC RESOURCES, INC., a Virginia Corporation et al., Plaintiffs,**

**v.**

**Kee Joe BENALLY, Census No. 90261 et al., Defendants.**

**Civ. No. 80–750 HB.**

United States District Court, D. New Mexico.

May 8, 1981.

Russell Moore, Phil Krehbiel, Keleher & McLeod, Albuquerque, N. M., Michael Comeau, Bigbee, Stephenson, Carpenter, Crout & Olmsted, Santa Fe, N. M., Douglas L. Irish, Marty Harper, Jose A. Cardenas, Lewis & Roca, Phoenix, Ariz., for plaintiffs.

Michael C. Nelson, Wayne H. Bladh, Alan R. Taradash, DNA–People's Legal Services, Inc., Window Rock, Ariz., for defendants Fred Adakai, Lenita Adakai, Kieyone Begay, Mary Haley Begay, John Kenneth Billy and Betty Rose Billy.

MEMORANDUM OPINION

BRATTON, Chief Judge.

This case involves a large-scale accident in the uranium industry in New Mexico and raises novel questions of Indian tribal jurisdiction over non-Indians. It is before the Court on plaintiffs' motion for a preliminary injunction and defendants' motion to dismiss.

I

FACTS

Plaintiff United Nuclear Corporation [1] owns and operates a mill for uranium ore near Churchrock, New Mexico. Close to the mill is a tailings area designed to hold solid and liquid wastes ("tailings") related to the milling process. These facilities are located on fee land south of the Navajo reservation.

1. UNC Resources, Inc., is the parent corporation of United Nuclear Corporation and UNC Mining & Milling Services, Inc., is its subsidiary. All are plaintiffs herein and are referred to collectively as "UNC."

In July 1979, the containment structure associated with UNC's tailings area failed. Solid and liquid tailings were released into an arroyo commonly called Rio Puerco of the West; these wastes flowed down the arroyo and into the State of Arizona. This incident came to be known as the Churchrock spill.

The course of the spill carried the wastes in a generally southwesterly direction through land occupied by Navajo Indians. All the land affected lies outside the boundaries of the Navajo reservation, but much of it is trust land and all of it falls within "Indian Country"—that checkerboard area of mixed federal, state, and tribal jurisdiction adjoining the reservation proper.

Many Navajos claimed that the tailings injured their livestock or caused them other harm. The defendants in this action are among this group.

On February 13, 1980, the Navajo Tribal Council approved a resolution providing in part:

> The civil jurisdiction of the Courts of the Navajo Nation is hereby amended to include civil actions in which the defendant is a resident of Navajo Indian country, or has caused an action to occur in Navajo Indian country.

Pursuant to this resolution, the defendants instituted civil suits against UNC in Navajo Tribal Court seeking compensatory and punitive damages stemming from the Churchrock spill. UNC anticipates that other such suits will be filed and that Navajo claims against it will exceed $30 million.

UNC filed this action seeking preliminary and permanent injunctions barring the defendants from pursuing their claims in Tribal Court; UNC also seeks a declaratory judgment that the Navajo Tribal Court does not have jurisdiction over it and a further declaratory judgment that it is not liable to the defendants as a result of the Churchrock spill. The defendants have moved to dismiss, asserting that this Court lacks jurisdiction to hear the case. They also oppose UNC's motion for a preliminary injunction, arguing that UNC's challenge to the tribe's jurisdiction is without merit.

The Court will first consider the scope of Navajo tribal jurisdiction, then the propriety of preliminary injunctive relief, and finally any additional issues relating to the motions before it.

## II

## TRIBAL COURT JURISDICTION

The principal issue in this lawsuit is raised by UNC's request that the Court enjoin the defendants from proceeding against UNC in Navajo Tribal Court and declare that the Tribal Court lacks jurisdiction over UNC. This Court has jurisdiction over this aspect of the case because of the substantial federal question presented. 28 U.S.C. § 1331.

The issue is one of retained tribal sovereignty.[2] No statute or treaty has been cited which expressly gives the Navajos authority to conduct civil lawsuits against non-Indians in Tribal Court. Nor has such power been expressly withdrawn from them. The situation is thus closely analogous to the one presented to the United States Supreme Court in *Oliphant v. Suquamish Indian Tribe*, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978).

In *Oliphant*, the Supreme Court held that an Indian tribe lacked the power to try non-Indians for criminal offenses committed on its reservation. The Court found no statute or treaty either authorizing the tribe in question to exercise criminal jurisdiction over non-Indians or prohibiting such exercise. The Court then rejected the Indians' argument that this power was an unsurrendered aspect of the tribe's original sovereignty.

Indian tribes, the Court held, do not retain powers that are "inconsistent with their status." 435 U.S. at 208, 98 S.Ct. at 1021; *see also United States v. Wheeler*,

2. UNC also challenges the Tribal Court's jurisdiction on other grounds, which need not be considered here.

435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). "Upon incorporation into the territory of the United States, the Indian tribes thereby come under the territorial sovereignty of the United States and their exercise of separate power is constrained so as not to conflict with the interests of this overriding sovereignty." 435 U.S. at 209, 98 S.Ct. at 1021. Having earlier noted that "the Bill of Rights in the Federal Constitution does not apply to Indian tribal governments," 435 U.S. at 194 n. 3, 98 S.Ct. at 1013 n. 3, the Court continued:

> [F]rom the formation of the Union and the adoption of the Bill of Rights, the United States has manifested ... [a] great solicitude that its citizens be protected by the United States from unwarranted intrusions on their personal liberty. The power of the United States to try and criminally punish is an important manifestation of the power to restrict personal liberty. By submitting to the overriding sovereignty of the United States, Indian tribes therefore necessarily give up their power to try non-Indian citizens of the United States except in a manner acceptable to Congress.

435 U.S. at 210, 98 S.Ct. at 1021. It followed that, in the absence of statutory authority, the tribe could not assert criminal jurisdiction over non-Indian defendants.

The *Oliphant* case controls here. The power to try and to assess civil penalties is the power to invade other liberties which the United States has an interest in protecting for its citizens against "unwarranted intrusions." Indian tribes therefore cannot exercise such civil jurisdiction over non-Indians without explicit congressional authorization.

The Navajos attempt to limit *Oliphant* to criminal cases, but the grounds they assert provide no basis for a distinction. Indeed, the factors they cite as present here were also present to an equal or greater extent in *Oliphant* but did not alter the result. They are therefore irrelevant to the determination of this case.

Thus, it does not matter that the Navajo Tribal Court may have evolved into a "sophisticated" tribunal "resembl[ing] in many respects [its] state counterparts." 435 U.S. at 211–12, 98 S.Ct. at 1022. This is a consideration "for Congress to weigh in deciding whether Indian tribes should finally be authorized to try non-Indians." *Id.* at 212, 98 S.Ct. at 1022.

Similarly, it is irrelevant that the Indian Civil Rights Act, 25 U.S.C. § 1302, and tribal laws accord certain basic rights to all litigants in Tribal Court. These rights are not coextensive with constitutional guarantees, *see* 435 U.S. at 184, 98 S.Ct. at 1008, so they do not solve the problem perceived by the Court in *Oliphant* —the potential for tribal infringement of protected liberties.[3]

Finally, it does not matter that the Navajo tribe may have an interest in holding tortfeasors responsible for injuries to Indian land. If the interest in punishing violations of tribal criminal law by persons on the reservation was insufficient to support tribal jurisdiction in *Oliphant*, the Navajo tribe's lesser interest in applying its civil standards of behavior to conduct off

3. The Indian Civil Rights Act (ICRA) is not a grant of tribal jurisdiction; it only specifies some rights that must be preserved if jurisdiction over non-Indians is ever conferred on the tribes. 435 U.S. at 195–96 n. 6, 98 S.Ct. at 1014 n. 6. It is noteworthy that the ICRA, while providing expressly for federal review of tribal criminal prosecutions through habeas corpus proceedings, by its terms creates no means through which a party to a civil suit in tribal court can invoke federal protection of his rights. *See Santa Clara Pueblo v. Martinez,* 436 U.S. 49, 98 S.Ct. 1670, 56 L.Ed.2d 106 (1978); *but see Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes,* 623 F.2d 682 (10th Cir. 1980), *petition for cert. filed,* 49 U.S.L.W. 3305 (U.S. Oct. 28, 1980) (No. 80–613). Nor does it appear under current statutes and case law that appeal or other recourse lies from a tribal court to any court outside the tribe. In the absence of a route to the United States Supreme Court, where the scope of federal rights under the Supremacy Clause must ultimately be decided, *Marbury v. Madison,* 5 U.S. (1 Cranch) 137, 2 L.Ed. 60 (1803), it is difficult to understand how a United States citizen who is not a tribal member could be required, in the absence of a contractual relationship or actual or implied consent, to appear as a civil defendant in a tribal court.

the reservation will not sustain its jurisdiction here.[4]

The result in this case is supported by the Supreme Court's recent decision in *Montana v. United States*, —— U.S. ——, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981), where the Court stated: "[E]xercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express Congressional delegation." *Id.* at ——, 101 S.Ct. at 1257. In that case, the Court held that an Indian tribe did not retain the power to regulate non-Indian hunting and fishing on non-Indian lands within the reservation. The matter was not "internal" because it related to persons other than tribal members, and it was not essential to tribal self-government because the tribe had long accommodated itself to extensive state control over hunting and fishing on fee lands within the reservation.

The situation here is similar. Navajo Tribal Court jurisdiction over non-Indian civil defendants necessarily involves the tribe's external relations, and it is not a power needed to protect tribal self-government because the tribal government has always been able to function without it. Such jurisdiction is therefore not part of the tribe's retained sovereignty.

In its opinion in *Montana v. United States*, the Supreme Court stated that the principles underlying *Oliphant*

> support the general proposition that the inherent sovereign powers of an Indian tribe do not extend to the activities of nonmembers of the tribe. To be sure, Indian tribes retain inherent sovereign power to exercise some forms of civil jurisdiction over non-Indians on their reservations, even on non-Indian fee lands. A tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements. A tribe may also retain inherent power to exercise civil authority over the conduct of non-Indians on fee lands within its reservation when that conduct threatens or has some direct effect on the political integrity, the economic security, or the health or welfare of the tribe.

at ——, 101 S.Ct. at 1258 (citations omitted). It thus appears that when the issue is Indian tribal power over non-Indians, any civil authority of the tribe stops at the reservation boundary. The Navajos therefore cannot assert jurisdiction over UNC based on its off-reservation uranium milling operations.

The Navajos, reading the cited language in *Montana v. United States* perhaps more broadly than it was written, may argue that they should be able to sue UNC in Tribal Court in damage suits arising out of the Churchrock spill for two reasons: first, because UNC has entered into consensual relationships with the tribe for its economic gain, and second, because the injuries caused by UNC's actions, if not the actions themselves, occurred on Indian land. As to the first point, none of UNC's dealings with the Navajo tribe relates directly to its Churchrock operations. The mill and tailings pond are on fee land. UNC obtains most of the ore it mills through mineral leases from non-Indian lessors.[5] Mineral leases covering tracts of reservation land are held by UNC, but these tracts are not in production. Thus, UNC's milling operations are so weakly linked to its economic relations with the Navajos that tribal juris-

4. The Navajos propose a balancing of interests and argue that UNC's stake in this suit is less than the personal liberty at risk in the case of a criminal defendant. It may be noted that the potential Navajo claims against UNC amount to a huge sum of money. But more significantly, UNC possesses due process rights as worthy of protection as any criminal defendant's. The Supreme Court did not weigh interests in *Oliphant*. Instead, it applied the rule that when an assertion of Indian sovereignty conflicts with an interest protected by the United States, tribal power must yield.

5. Some ore processed at UNC's mill comes from reservation land, but that ore is mined by another company and milled by UNC for that company.

diction cannot be extended to UNC's milling activities on this basis.

Further, it has never been held that a consensual relationship with an Indian or a tribe will subject a non-Indian to civil liability in a tribal court. The closest case, *Williams v. Lee,* 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), holds only that an on-reservation merchant must sue in the tribal court to recover payment for goods sold on credit to a reservation Indian. There is a basis for treating the merchant as having implicitly consented to be a plaintiff in tribal court: he knew he was dealing with an Indian, and he could limit his credit sales and thus control the size of the claim he would have to take to the tribe for resolution. A tort defendant is much more at the mercy of chance regarding the nature and extent of the liability to which he may be exposed. It is doubtful whether UNC could ever be said to have consented to Navajo Tribal Court jurisdiction as a tort defendant, regardless of how extensively it might have done business with the tribe.

As to the second point, the issue here is not whether the Navajo tribe can regulate UNC's off-reservation activities in order to protect Indian land. Some kind of regulation of some kinds of activities may be within the tribe's power. But any such power does not include requiring UNC to answer as a civil defendant in Tribal Court for its off-reservation activities; that issue was settled by *Oliphant.*

It is therefore concluded that the Navajo Tribal Court cannot assert jurisdiction over UNC in damage suits resulting from the Churchrock spill. When the Tribal Council approved its resolution purporting to enlarge the Tribal Court's jurisdiction to include such suits, it was asserting a power that the tribe does not possess.

## III

## PRELIMINARY INJUNCTION

It appears from the foregoing that UNC will ultimately prevail on its claim that the Navajo Tribal Court lacks jurisdiction over it. The next inquiry is whether the other requirements for the grant of a preliminary injunction have been met. It must be shown that UNC faces serious harm and that this harm outweighs any burden an injunction would impose on the defendants or on the public interest. *See Valdez v. Applegate,* 616 F.2d 570 (10th Cir. 1980); *see generally* 11 C. Wright & A. Miller, Federal Practice & Procedure § 2948 (1973).

UNC is threatened with irreparable harm if a preliminary injunction is not granted. Without an injunction, UNC would be forced to appear and defend in Tribal Court; were it not to appear, the Navajo plaintiffs there could obtain default judgments that the tribe might attempt to execute against UNC's interests on the reservation. The burden on UNC of defending numerous Tribal Court actions would be substantial. Any judgments obtained against UNC after trial might also be executed by the tribe. In such a closed system, it would be difficult if not impossible for UNC to find recourse to another forum that could protect it from the tribe's overreaching jurisdiction. The only way adequately to protect UNC from this potentially irremediable injury is to enjoin the defendants from proceeding further in Tribal Court.

The defendants will not be harmed if they are prevented from suing UNC in Tribal Court. Although one of them stated that she preferred to sue in Tribal Court because "the laws are there that apply to the Navajos," the defendants' rights can be vindicated in a state or federal court of competent jurisdiction. Nor will the public interest be harmed by an injunction preventing the defendants from participating in an unlawful exercise of tribal power.

It is therefore concluded that a preliminary injunction should be issued enjoining the defendants from further pursuing their Tribal Court actions against UNC arising out of the Churchrock tailings spill.

## IV

## REMAINING CLAIMS

In addition to challenging tribal jurisdiction, UNC seeks to have this Court

establish, through a declaratory judgment action, that UNC is not liable to any of the defendants as a result of the Churchrock spill. The Navajos dispute the Court's jurisdiction to entertain such an action, and both sides have argued at length over technicalities of federal, state, and tribal jurisdiction in regard to this issue. The short answer to the matter, however, is that "it is not one of the purposes of the declaratory judgments acts to enable a prospective negligence action defendant to obtain a declaration of non-liability." *Frito-Lay, Inc. v. Dent,* 373 F.Supp. 771 (N.D.Miss.1974), *quoting* 10 C. Wright & A. Miller, Federal Practice & Procedure § 2765 (1973). The Court therefore will not exercise its discretion to hear a declaratory judgment action concerning UNC's liability to the Navajos, and this claim will be dismissed.

UNC argues that, even if a declaratory judgment is inappropriate, the Court should entertain its claim because it amounts to an equitable "bill of peace" consolidating the multiple Tribal Court suits against it into a single proceeding in this forum. Action in those suits, however, will be enjoined, and the Navajos who choose to pursue their claims will do so in state or federal court where the cases can be consolidated. No grounds therefore exist for any equitable relief.

## V

## CONCLUSION

In summary, this Court will preliminarily enjoin the defendants from further proceeding in Navajo Tribal Court and will dismiss any claims involving a determination of UNC's liability for damages caused by the Churchrock spill. Whether this action should be extended to reach a proposed class of defendants and whether a final injunction and declaratory judgment on the subject of Navajo Tribal Court jurisdiction should be issued remain to be determined.