OPINION AND ORDER
Gary P. Sullivan, Chief Justice.

FACTUAL OVERVIEW AND PROCEDURAL HISTORY

The plaintiff, Wolf Point Community organization (“WPCO”), is a duly recognized community organization established under authority of Article VII, § 9[1] of the Constitution and By-laws of Fort Peck Assiniboine and Sioux Tribes, and formally approved by resolution of the Tribal Executive Board[2]. Article II of WPCO’s Constitution and By-Laws sets forth the purpose of the organization, which includes “provid(ing) for the prosperity, social, economic, educational, industrial, and other defined needs of the membership” and for the purpose of establishing a “recognized and approved community organization, to protect the vested interest of Tribal membership in all matters” and to work with the Fort Peck Tribal Executive Board, “... to provide for the prosperity, social, economic, educational, industrial, and other defined needs of the membership.”
Pursuant to §§ 8 and 9[3] of Article VII of the Fort Peck Tribes’ Constitution, the Tribes delegated certain of the governmental functions to WPCO including the authority to administer WPCO’s share of those tribal funds identified as “Docket 184” set aside funds. (See Tribal Resolution No. 3339-87-10.) The Constitution and By-laws of WPCO, as provided by the Fort Peck Tribal Executive Board, also vested WPCO with the authority to exercise governmental powers including: the power to negotiate with federal, state and local governments, the Tribes and others on behalf of the Organization; the power to consult with such representatives on all activities which may affect the Organization; and the power to employ legal counsel for the protection of the Organization; and the power to promote public health, education and security, charity and such other services as may contribute to the *293 social and economic advantage of the Organization. In a private letter ruling[4] dated September 15, 1989, the Internal Revenue Service found that WPCO is an “integral” part of the Assiniboine and Sioux tribes of the Fort Peck Indian Reservation, and the provisions of IRC § 7871[5] are applicable to it. Accordingly, WPCO is entitled to certain federal tax benefits.
In accordance with its vested authority and in satisfaction of its obligations, WPCO has, from time to time, undertaken to invest the Docket 184 monies entrusted to its care for the purpose of enhancing the economic security of its membership. One such investment made by WPCO was effected through the services provided by the defendants, Investment Centers of America, Inc., (“ICA”) and Mr. John Shae, (“Shae”) an agent of ICA. This investment was allegedly made after ICA, through its agent, John Shae, entered the boundaries of the Fort Peck Indian Reservation for the purpose of inducing WPCO to purchase securities in the Krupp Government Income Trust (“Krupp Trust”). Through a series of alleged misrepresentations to WPCO regarding the “ultra safe” nature of the investment and a guaranteed return from the investment, Shae, allegedly induced WPCO to invest nearly $840,000.00 of its Docket 184 monies in the Krupp Trust. From the date of the initial investment in 1990 through August of 1997, ICA, through its agents, allegedly engaged in an on-going pattern of concealing from WPCO the true nature of the investment. In August of 1997, WPCO alleges that it learned, for the first time, that it had been deceived by ICA. Contrary to the alleged representations of the ICA, the interest income WPCO actually received from the Krupp Trust during the seven years was substantially less that had been represented to it by the ICA, and WPCO suffered a loss in the principal investment of the approximate amount of $350,000.00.
The WPCO complaint makes allegations as to the other defendant, CHMS, P. C., as follows: CHMS has maintained on-going consensual business relations with WPCO since sometime around 1990. CHMS has provided bookkeeping, accounting, auditing, and advisory services to WPCO, for which it has received compensation over the years, pursuant to written contracts. Despite CHMS’ intimate knowledge of WPCO’s financial affairs and professional obligation to accurately convey the worth of WPCO’s financial affairs and professional obligation to accurately convey the worth of WPCO’s financial status, it failed to do so.
On September 11, 1998, WPCO filed its verified Complaint and Demand for Jury Trial with the Fort Peck Tribal Court. The complaint alleges counts of deceit, actual fraud, constructive fraud, negligent misrepresentation and negligence against ICA and Shae; claims of breach of contract and negligent training and supervision against ICA; and claims of negligence and breach of contract against CHMS. The *294 claims arise over the investment of money by WPCO in 1990, in securities offered by ICA through its agent, Shae. Essentially WPCO claims that the securities purchased did not perform as represented by ICA and Shae, resulting in monetary losses to WPCO. About the same time, or shortly thereafter, CHMS began providing bookkeeping, accounting, auditing, services to WPCO. The complaint contends generally that CHMS breached a duty to WPCO, by failing to discover and report that the figures provided by ICA to WPCO on the value of the securities were not accurate.
On November 3, 1998, ICA and Shae filed their joint Special Appearance, Motion to Dismiss and Supporting Brief, alleging four separate grounds for dismissal. On November 4, 1998, CHMS filed its Notice of Special Appearance and Motion to Dismiss, and Brief in Support of Motion to Dismiss. The Affidavit of Robert Maxie in support of its Motion to Dismiss was submitted by CHMS on November 10, 1998. On November 24, 1998, CHMS filed its Amended Motion to Dismiss, which adopted by reference the additional grounds for dismissal as asserted by Defendants ICA and Shae in their original Motion to Dismiss.
Hearing on the motions was held before The Honorable Marvin Youpee on July 12, 1999, at which time Judge Youpee ruled from the bench denying Appellants’ respective Motions to Dismiss.
On July 22, 1999, ICA and Shae petitioned this Court for review of the Order denying their Motion to Dismiss for lack of subject matter jurisdiction. CHMS’ Petition for Review was filed July 26, 1999. This Court issued its Order Granting both Petitions for Review and setting the Briefing Schedule on August 30, 1999. After a series of continuances, oral argument was heard on January 14, 2000, and the matter was submitted.
ISSUES PRESENTED BY ICA AND SHAE
ICA and Shae base their petition for review on four[6] separate grounds:
1) The Tribal organic documents do not establish that the Court has jurisdiction of this matter;
a. The April 15, 1874 Act which created the reservation does not grant civil jurisdiction over nonmembers of the tribe;
b. The Tribal Constitution itself does not permit this lawsuit against non-Indians;
2) The Tribal Court lacks subject matter jurisdiction because:
a. Tribal jurisdiction over the conduct of nonmembers exists only in limited circumstances,
b. The alleged conduct that is the subject of the complaint did not occur within the exterior boundaries of the reservation and, therefore, the general rule in Montana applies; further, neither of the two exceptions in Montana applies
3) The Tribal Court lacks jurisdiction in this matter because the complaint alleges quasi-criminal claims and seeks punitive civil penalties.
4) WPCO is not a real party in interest and, therefore, the Tribal Court lacks jurisdiction.

*295
ISSUES PRESENTED BY CHMS

CHMS contends that the Tribal Court lacks jurisdiction in light of the recent federal decisions that CHMS believes have narrowly defined the circumstances under which Tribal Courts may assert subject matter jurisdiction over non-Indians for torts occurring on non-Indian fee land. CHMS further contends that the Tribal Court lacks jurisdiction for tort claims alleging accountant malpractice committed by non-Indians at offices located on non-Indian fee land. CHMS acknowledges the two exceptions set forth in Montana v. U.S., however, it is their contention that neither exception applies to the facts in this case.

STANDARD OF REVIEW

“The jurisdiction of the Court of Appeals shall extend to all appeals from final orders and judgments of the Tribal Court. The Court of Appeals shall review de novo all determinations of the Tribal Court on matters of law, but shall not set aside any factual determinations of the Tribal Court if such determinations are supported by substantial evidence”. Title II CCOJ 2000 § 202. We have previously determined that a denial of a motion to dismiss is a final order for the purposes of § 202. (In re: Custody of M.W. FPCOA # W).
Whether our Tribal Court has subject matter jurisdiction or in personam jurisdiction are both questions of law, thus we review these matters de novo.
DISCUSSION

I. Issues raised by ICA and Shae.

Organic documents argument. As their threshold issue, ICA and Shae contend that our Tribal Court does not have jurisdiction because the Tribes’ organic documents do not grant it civil jurisdiction over non-Indians. To support this proposition, ICA and Shae cite the April 15, 1874 Act and the Fort Peck Tribes Constitution.
April IS, 1874 Act. After giving the Court an overview of the Congressional history of the Assiniboine and Sioux Tribes, ICA and Shae summarize their argument by stating that a review of the Congressional record, “... demonstrate(s) the tribe did not reserve or retain any civil jurisdiction over nonmembers.” If we understand this argument correctly, if Indian tribes did not expressly provide for civil jurisdiction over non-Indians in their treaties with the United States government during the “treaty making period” of 1787 through 1871, and if Congress did not expressly provide for such jurisdiction in the subsequent Congressional Acts which ratified those treaties, then Tribal Courts today, operating in the 21st century, have no such jurisdiction. We must respectively disagree.
This “failure to provide in the organic documents” argument summarily disregards over one-hundred and thirty year’s of United States Supreme Court decisions which have fashioned rules of construction for these treaties and the relationship of the United States with Indian Tribes. One such rule provides for these treaties to be construed, as those tribal representatives who participated in their negotiation understood them. (Tules v. Washington, 315 U.S. 681, 685, 62 S.Ct. 862, 86 L.Ed. 1115)
Illustrative of the many fallacies in their “organic documents” argument, ICA and Shae, in their historical overview of Indian country, cite “contemporaneous tribal oral history” regarding the 1868 Fort Laramie Treaty (15 Slat. 635). They offer as characteristic of this testimony, statements by Marvin Thin Elk (“The great Sioux Nation will govern itself, will govern its people”); *296 Evelyn Gabe (“ ‘Our tribal system of government, our leaders, our chiefs, our head men’ were to govern the Lakota people.”); George Gap (“The treaty meant that ‘they will govern themselves within the Sioux nation.’ ”); Eugene White Hawk (“The Sioux people ... will govern themselves.”). These statements, according to ICA and Shae, confirm the understanding that the Sioux were to govern only their own people and not non-Indians. (See ICAJShae brief at paye 7) We again must respectively disagree.
These statements were taken from U.S. v. Consolidated Wounded Knee Cases, 389 F.Supp. 235 (D.Neb.1975). In the Wounded Knee Cases, various Indian defendants (approximately sixty-five) were criminally charged with acts that were allegedly committed on the Pine Ridge Indian Reservation in the vicinity of Wounded Knee, South Dakota. They were charged in federal court and moved for dismissal on the ground that “the Courts of the United States do not have the power and jurisdiction to judge the guilt or innocence of individuals who are citizens of other Nations for alleged crimes committed on the soil of other Nations.In other words, the defendants were asserting the exclusivity of tribal jurisdiction in criminal matters involving Indians. Any suggestion that the statements quoted supra “confirm the understanding that the Sioux were to govern only their own people and not non-Indians” defies reason. The sole purpose of this testimony was to convince the Federal District Court that, “(w)hat the Sioux principally and naturally were interested in at the time of the signing of the treaty, as far as it touched government, was a leaving undiminished of their authority to punish their own.” (Wounded Knee Cases at 242).
Further illustrating the tenuousness of their argument, ICA and Shae state, “A review of both the April 15, 1874 Act and the May 1, 1888 Act demonstrate that the tribe did not reserve or retain any civil jurisdiction over nonmembers. The Act of 1874 simply delineated the new boundaries of the then Blackfeet Reservation.” (See ICAJShae brief at p. 6) ICA and Shae go on to detail various Articles in the Act of 1888, concluding, “Thus, nothing in the Act provided expressly, or even implicitly, for civil jurisdiction over non-Indians. Indeed, the widely held understanding at the time was the Indian tribes would not have civil or criminal jurisdiction over non-Indians.” After this conclusory statement, they cite Raymond v. Raymond, 83 F. 721, 722 (8th Cir. (Indian Territory) 1897), as standing for the proposition “Cherokee courts were effective only as to the ‘rights of the persons and property of members of the Cherokee Nation as against each other’ ”. (See ICAJShae brief at p. 7, our emphasis) In fact, one needs only to read Raymond to reveal the inaccuracy of this statement. First, the Raymond court cited Article 8 of the treaty of July 2, 1791 (7 Stat. 39), which provided: “If any citizen of the United States, or other person not being an Indian, shall settle on any of the Cherokees’ lands, such person shall forfeit the protection of the United States and the Cherokees may punish him or not, as they please.”[7] Secondly, Raymond had nothing to do with non-Indians ousting tribal *297 courts of their jurisdiction, however it had everything to do with a federal court reversing a U.S. court of appeals in the Indian territory (37 S.W. 202) which had granted a U.S. citizen a divorce and alimony against an Indian who was a member of the Cherokee Nation. Indeed, Raymond upheld a tribal court decree of divorce involving a white woman who had intermarried into the Cherokee Nation.
ICA and Shae also cite In re: Mayfield, 141 U.S. 107, 11 S.Ct. 939, 35 L.Ed. 635 (1891) to support their notion that the “widely held understanding at the time was the Indian tribes -would not have civil or criminal jurisdiction over non-Indians.” They conclude from their reading of May-field: “(The) Court discussed treaty and statutory provisions reflecting that federal, not tribal, courts would have jurisdiction in all civil and criminal cases unless the only parties to a case were tribal members.” (ICA/Shae brief at p. 7) Mayfield is somewhat similar to the Wounded Knee Cases, in that an Indian, a member of the Cherokee Nation, was being tried in a U.S. Court for the crime of adultery. He applied to the federal district court for a writ of habeas corpus. In support of his writ, Mayfield argued that the court in Indian country had exclusive jurisdiction over him. The federal district court agreed with Mayfield and granted the writ. The conclusion, cited above, reached by ICA and Shae regarding Mayfield is, at best, propagandistic. It is true that the district court, In obiter dictum, recounted treaty and statutory provisions reflecting on jurisdiction. However, our defendants fail to consider other important factors. For example, the Mayfield court cited two important articles of the July 19, 1886 treaty between the United States and the Cherokee Nation, (14 Slat. 799) one of which follows:
“The thirteenth article of the same treaty provides as follows: ‘The Cherokees also agree that a court or courts may be established by the United States in said Territory, with such jurisdiction and organized in such manner as may be prescribed by law: Provided, That the judicial tribunals of the nation shall be allowed to retain exclusive jurisdiction in all civil and criminal cases arising within their country in which members of the nation, by nativity or adoption, shall be the only parties, or ivhe-re the cause of action shall arise in the Cherokee Nation, except as otherwise provided in this treaty.’ ” (Mayfield: at p. 113) (our emphasis)
ICA and Shae quote the following from the very same treaty: “...’the United States District Court, the nearest the Cherokee Nation, shall have exclusive original jurisdiction of all causes, civil and criminal,’ where one party is a non-Indian, non-resident.” Remarkably, our defendants, once again, present a slanted, partial view. The quote is from Article Seven of the treaty. Defendants’ quote is significantly limited by two phrases, which immediately precede it: “The United States count to be created in the Indian Territory; and until such court is created therein ...” (and then defendants’ quote above, follows).
Nonetheless, it is unnecessary to show the lack of historical support for defendants’ “organic documents” argument. One needs only to review those federal decisions within the one hundred thirty ensuing years to conclusively show that tribal courts do have jurisdiction over non-Indians for reservation based claims. The U.S. Supreme Court, in one such decision, summarily stayed a diversity action in federal district court to allow a tribal court to determine its own jurisdiction over parallel litigation, stating:
*298 “Tribal authority over the activities of non-Indians on reservation lands is an important part of tribal sovereignty. (Citations omitted) Civil jurisdiction over such activities presumptively lies in the tribal courts unless affirmatively limited by a specific treaty provision or federal statute. ‘Because the Tribe retains all inherent attributes of sovereignty that have not been divested by the Federal Government, the proper inference from silence ... is that the sovereign power ... remains intact’. (Citations omitted)” Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 107 S.Ct 971, 977-978, 94 L.Ed.2d 10 (1987)
Fort Peck Tribes’ Constitution and ByLaws. ICA and Shae begin this portion of their “organic documents” argument by stating, “No constitutional government can exercise powers broader than provided by its people in the constitution .... Under the Tribal Constitution, the tribe has limited power.” Article VII § 5 states:
“Section 5. To provide, subject to the review of the Secretary of the Interior, or his authorized representatives, for the maintenance of law and order and the administration of justice by establishing tribal courts and police force, and defining the powers and duties of same, and to promulgate criminal and civil codes or ordinances governing the conduct of the members of the Tribes and non-member Indians residing within the jurisdiction of the Tribes.”
Defendants go on to suggest that § 5 limits all tribal civil codes and ordinances to the conduct of members of the tribes and nonmember Indians residing on the reservation. Apparently this conclusion is reached by limiting the whole of § 5 by the last phrase. If we understand defendants’ argument correctly, § 5 limits the Tribal Executive Board’s authority to “promulgate criminal and civil codes or ordinances governing the conduct of members and nonmember Indians residing with the jurisdiction of the Tribes (only ).”
In order to arrive at that limiting conclusion, ICA and Shae necessarily imply that the word “only” appears at the conclusion of the sentence. However, the word “only” does not appear and we find no such limitation was intended.
First, § 5 is comprised of a compound sentence. The first part authorizes the Tribal Executive Board, “To provide ... for the maintenance of law and order and the administration of justice by establishing tribal courts and police force, and defining the powers and duties of same.... ” This phrase constitutes a “stand alone” grant of authority and there are no limiting indicators, express or implied. Thus, the Tribal Executive Board was granted full authority to provide for the “maintenance of law and order and the administration of justice” by defining the powers and duties of the tribal courts and police force.
One of the first and most fundamental steps in providing for “law and order and the administration of justice” is establishing jurisdiction for the Tribal Court. Our TEB accomplished this in the enactment of Title II CCOJ 2000 § 106 (jurisdiction in Criminal matters), Title II CCOJ 2000 § 107[8] (jurisdiction in Civil matters) and
*299 Title II CCOJ 2000 § 108[9] (jurisdiction over persons outside the Reservation).
Defendants’ interpretation would render §§ 107 and 108, not only unnecessary, but void for want of constitutionality. Moreover, such a narrow interpretation would effectively prevent the TEB from executing its mandate to “provide for the maintenance of law and order and the administration of justice” by precluding tribal court jurisdiction over many of the residents within the exterior boundaries of the Fort Peck reservation who are neither members, nor Indians. Such limitation would be an anathema on any government. We can think of no circumstance under which the framers of the Fort Peck Constitution and By Laws would intend to bring about such a result.
In arriving at our conclusion, we believe that we have used a rale of constitutional construction that has been in effect since the early beginnings of the United States government and fashioned by no less an authority than Chief Justice John Marshall:
“The rule of constitutional construction is thus laid down by Chief Justice Marshall: ‘The intention of the Instrument must be collected from its words; its words are to be understood in that sense in which they are generally used, by those for whom the instrument was intended; its provisions are neither to be restricted into insignificance nor extended to objects not comprehended in them, nor contemplated, by its framers."’ United States v. Three Tons of Coal, 28 F.Cas. 149, 6 Biss. 379, 1875 U.S. Dist. LEXIS 56 (E.D.Wis.1875) (quoting Chief Justice Marshall) (our emphasis)
Finally, for the reasons stated, we hold that neither the Act of April 15, 1874, nor the Fort Peck Constitution and By Laws prohibit our tribal court from exercising civil jurisdiction over non-Indians for reservation-based claims.
Lack of subject matter jurisdiction. Defendants’ second issue challenges the Tribal Court’s subject matter jurisdiction based upon the U.S. Supreme Court holdings in Montana v. U.S., 450 U.S. 544, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981) and Strate v. A-1 Contractors, 520 U.S. 438, 117 S.Ct. 1404, 137 L.Ed.2d 661 (1997).
In Strate, a non-Indian widow, resid-ingl[10] on the Fort Berthold Reservation, was seriously injured in a vehicular accident on a North Dakota highway that runs for 6.59 miles through the Three Affiliated Tribes’ Reservation. The State of North Dakota maintained the highway pursuant to a federal grant for that purpose. The other vehicle was owned by A-l Contractors, which was based off the Reservation and which had contracted with a wholly owned subsidiary of the Three Affiliated Tribes for landscaping work on the Reservation. Stockert, an A-l employee, who lived off the Reservation, drove the A-l vehicle. The Strate court held that Mon *300 tana provided the general rule. Montana held that Tribal governments lacked jurisdiction to regulate hunting and fishing of non-members when that activity takes place on non-Indian, alienated land, subject to only two exceptions. In accord with the general rule set forth in Montana, the Strate court held that when a non-Indian sues a non-Indian for damages arising from an injury suffered on non-Indian alienated territory, the Tribal Court lacked jurisdiction. The Strate court restated the two exceptions articulated in Montana:
“Montana thus described a general rule that, absent a different congressional direction, Indian tribes lack civil authority over the conduct of nonmembers on non-Indian land within a reservation, subject to two exceptions: The first exception relates to nonmembers who enter consensual relationships with the tribe or its members; the second concerns activity that directly affects the tribe’s political integrity, economic security, health, or welfare. The Montana Court recognized that the Crow Tribe retained power to limit or forbid hunting or fishing by nonmembers on land still owned by or held in trust for the Tribe. Id., at 557, 101 S.Ct. 1245. The Court held, however, that the Tribe lacked authority to regulate hunting and fishing by non-Indians on land within the Tribe’s reservation owned in fee simple by non-Indians. M, at 564-567, 101 S.Ct. 1245,” (Id. at pp.446-447)
Thus, when analyzing whether our Tribal Court lacks subject matter jurisdiction based upon the Strate and Montana, doctrines, we ask two questions, in the following order: 1) Where did the subject activity take place; and if the subject activity took place on non-Indian, alienated land within the boundaries of the reservation, does it qualify as an exception under the Montana general rule: (a) was the non-Indian defendant engaged in a consensual relationship with the tribe or its members or (b) does defendant’s activity complained of directly affect the tribe’s political integrity, economic security, health, or welfare.
Location of subject activity. For the puipose of a motion to dismiss and other “summary actions”, the general rule was stated in Kennedy v. Roosevelt County, FPCOA # 281:
“Applying these rules, it is clear that, we must accept as true the pleadings and evidence submitted by plaintiff in support of her claim against defendant Rusche. Additionally, in determining whether plaintiffs evidence is sufficient, neither our Tribal court, nor this Court, may weigh the evidence or consider witnesses’ credibility. Instead, our Courts must accept as true the evidence most favorable to plaintiff and must disregard conflicting evidence. The court must give to the plaintiffs evidence all the value to which it is legally entitled, indulging every legitimate inference that may be drawn from the evidence in plaintiffs favor. However, we pause to note that a mere ‘scintilla of evidence’ does not create a conflict for the jury’s resolution; there must be substantial evidence to create the necessary conflict.” (at p. 4)
In its complaint, WPCO alleges a “consensual relationship” with ICA and Shae that was entered into within the boundaries of the Fort Peck Reservation and was a result of “commercial dealings conducted within the exterior boundaries of the Fort Peck Reservation” (see WPCO complaint, ¶ 10). However, the complaint is silent regarding the exact location of these “commercial dealings”. ICA and Shae contend that Shae was “enticed” by a specific invitation from WPCO to make an *301 investment presentation, which took place at a casino in Wolf Point, MT. Defendants conclude that since the casino in Wolf Point is “open to the public” it is ‘non-Indian alienated’ land for the purposes of a Stmts analysis.
As stated above, for the purposes of a Motion to Dismiss and other summary motions, we apply the Kennedy rule. Thus, we are obliged to “accept as true the pleadings and evidence” submitted by plaintiff in support of its claims against the defendants. Further, we must “disregard conflicting evidence” presented by defendants’ in support of their Motion to Dismiss. We note in passing that it could be concluded that WPCO’s complaint is sufficiently general as to not conflict with defendants’ version of the location of the commercial dealings. That is, we could infer that, if defendants’ version were not true, WPCO would have pled the location of the commercial dealings with greater specificity. However, we decline such indulgence to determine factual matters at the appellate level and we therefore leave this issue to be decided at the appropriate time in the Tribal Court.
Therefore, we hold that, based upon the facts available to the Tribal Court at the time of the Motion to Dismiss, this matter did not “qualify” for a Montana/Strate analysis in that WPCO’s verified complaint, on its face, pleads a reservation based consensual relationship. We further hold that if defendants’ should require that we re-visit this issue at a later time, such timing should coincide with a denial of a post trial motion and not before. This is not to suggest that we abridge any of defendants’ rights to bring on any motion in the Tribal Court at any time. We only advise the parties that we shall not be inclined to re-visit the issue ourselves until a full trial on the merits has taken place and that each party has had full opportunity to present to the Tribal Court their version of the location of these “commercial dealings”.
Quasi-criminal claims and punitive damages. In their third issue, Defendants contend WPCO’s plea for punitive damages brings the case under the rule set forth by the U.S. Supreme Court in Oliphant v. Suquamish Indian Tribe, 435 U.S. 191, 98 S.Ct. 1011, 55 L.Ed.2d 209 (1978), which held that Tribal Courts do not have criminal jurisdiction over non-Indians. After quoting from that portion of WPCO’s complaint that prays for punitive damages, ICA and Shae conclude that WPCO seeks to have the Tribal Court punish them for their alleged conduct. “Accordingly, under Oliphant, the case must be dismissed”. (See ICA/Shae brief at page 26).
To buttress their argument, defendants cite UNC Resources, Inc. v. Benally 514 F.Supp. 358, 360 (D.N.M.1981), as holding “that Oliphant dictates that a tribe cannot assess civil penalties against non-Indians without explicit Congressional authorization.” (id.) We disagree for two reasons.
First, it should be noted that defendants do not claim that Oliphant prohibits tribal courts from awarding punitive damages. Rather, ICA and Shae state that, “(subsequent courts have applied Oliphant to proscribe jurisdiction over punishments that are quasi-criminal in nature.” (See ICA/ Shae brief at page 26) They go on to give us their version of the UNC holding (as shown above). In UNC, the federal district court of New Mexico was confronted with a large-scale uranium industry accident, which became known as the “Chur-chrock spill”, wherein liquid and solid waste spilled onto trust land lying adjacent to the Navajo Indian Reservation. Many Navajos claimed that the tailings injured their livestock or caused them other harm. The defendants in UNC were among that *302 group. The Navajo Tribal Council approved a resolution amending civil jurisdiction of the Courts of the Navajo Nation to include civil actions “in which the defendant is a resident of Navajo Indian country, or has caused an action to occur in Navajo Indian country.” As a result, several Navajos filed suit in the Navajo Tribal Court seeking compensatory and punitive damages stemming from the Churchrock spill. UNC filed an action in federal district court seeking preliminary and permanent injunctions barring Benally and others from pursuing their claims in Tribal Court. The UNC court issued the injunction stating:
“The Oliphant case controls here. The power to try and to assess civil penalties is the power to invade other liberties, which the United States has an interest in protecting for its citizens against ‘unwarranted intrusions.’ Indian tribes therefore cannot exercise such civil jurisdiction over non-Indians without explicit congressional authorization.” (5U F.Supp. at 361)
Defendants conclude from this holding that tribal courts do not have the power to award punitive damages against non-Indian defendants. This conclusion is without support and is unwarranted. In explaining the UNC ruling, an Arizona federal district court, after discussing the “consensual relationship” requirement of Montana, noted:
“This limitation, for example, would distinguish Judge Bratton’s recent decision in UNC Resources, Inc. v. Benally, 514 F.Supp. 358 (1981), wherein the Court took the position that the Navajo Tribe could, 'not assert civil jurisdiction over a defendant who’s operations outside the reservation inadvertently caused: contamination of reservation water.” (Babbitt Ford v. Navajo Indian Tribe, 519 F.Supp. 418, 431 n. 8) (our emphasis)
As shown by the explanation of the UNC holding by the Babbitt Court, the facts in this case are clearly distinguishable from those in UNC.
Indeed, more recently a New Mexico Appeals Court ruled that New Mexico tribal courts do have the power to award punitive damages against non-Indian defendants. Halwood v. Cowboy Auto Sales, 124 N.M. 77, 946 P.2d 1088 (N.M.App. 1997). In Halwood a Navajo Tribal Court granted Indian Plaintiffs a default judgment consisting of compensatory, statutory, and punitive damages for non-Indian Defendants’ wrongful repossession of Plaintiffs’ car from the reservation. Plaintiffs then sought to enforce the judgment in a New Mexico district court. That court enforced the judgment, except for the punitive damages portion. Determining that the punitive damages were penal in nature, the district court reasoned that the Navajo court was without jurisdiction to award them against non-Indians. The New Mexico Court of Appeals concluded that the punitive damages awarded in that case were not penal in the criminal sense and thus fell within the Navajo tribal court’s jurisdiction. The Halwood Court went on to hold that New Mexico courts should recognize such judgments from tribal courts under the doctrines of full faith and credit or comity.
It should also be noted that in analyzing the nature of punitive damages, it is necessary to distinguish the purpose of those damages before drawing the conclusion that “all exemplary and punitive” damages are “quasi-criminal” sanctions. We believe that exemplary or punitive damages awarded in a civil proceeding are not quasi-criminal in nature because the purpose of those damages is to make reparations to individual plaintiffs, not to the *303 tribal government, or the community as a whole. We wholeheartedly agree with the Halwood Court quoting from one of its earlier decisions:
“A statute penal ... [within the rules of private international law] is one that awards a penalty to the state ... or to a member of the public, suing in the interest of the whole community to redress a public wrong. [Cites omitted] The purpose must be, not reparation to one aggrieved, but vindication of the public justice.... The statute is not penal in the international sense ... [when] the purpose of the punishment is reparation to those aggrieved by his offense.” (id., 124 N.M. at 80, 946 P.2d at 1091)
Finally, even if we were to accept defendants’ argument that tribal courts are prohibited from awarding punitive damages against non-Indian defendants, (and we certainly make no such ruling) that holding would not warrant dismissal of the entire complaint. Accordingly, we hold that our tribal court has jurisdiction to award punitive damages against non-Indian defendants for reservation-based claims where such damages are otherwise legally appropriate.
Real party in interest. Finally, ICA and Shae contend that WPCO “transferred all right, title, and interest in the Krupp shares (to the Bureau of Indian Affairs {BIA}) and, therefore is not the real party in interest to bring this suit.” Defendants ultimately conclude that since WPCO is not the real party in interest, the suit must be dismissed. Defendants cite no authority for this proposition. On the other hand, WPCO acknowledges a “Collateral Assignment of Certificate 1001” in favor of the United States of America, acting through the BIA, however, contend that the assignment was executed for the purpose of providing “collateral security” for any liabilities of WPCO to the BIA. (WPCO brief at page 33). Both parties argue differing positions as to the extent of the assignment and the rights of both WPCO and the BIA. In our opinion, this argument is best decided in the Tribal Court. We acknowledge that ICA and Shae raised this issue in their Motion to Dismiss; however, we again refer to the general rule set forth in Kennedy, which requires that for the purpose of a summary proceeding we “must accept as true the evidence most favorable to plaintiff and must disregard conflicting evidence.” Further, we “must give to the plaintiffs evidence all the value to which it is legally entitled, indulging every legitimate inference that may be drawn from the evidence in plaintiffs favor.” Thus, for dismissal purposes, WPCO’s version is accepted and we hold that WPCO is a proper party to bring the causes of action set forth in its complaint. Defendants have the opportunity to rebut this conclusion by providing evidence to the contrary at trial.
2. Issues raised by CHMS.
In addition to incorporating all of their co-defendants’ issues and adopting them as their own, CHMS presents an issue of first impression: “Whether the Fort Peck Tribal Court has subject matter jurisdiction of a civil tort action for professional malpractice against a non-Indian accounting firm with offices located on non-Indian alienated land within the exterior boundaries of the Fort Peck Tribal Reservation.”
Accounting malpractice. According to WPCO’s complaint, CHMS is a Montana professional corporation of certified public accountants with offices in the State of Montana[11]. In 114 WPCO alleges *304 “CHMS, through its agents, entered a consensual relationship with WPCO and its members, whereby CHMS provided bookkeeping, accounting, auditing, and advisory services to WPCO within the exterior boundaries of the Fort Peck Indian Reservation.” Later in the complaint, WPCO sets forth allegations of negligence and breach of contract (¶¶ 39-49). While we do not believe that WPCO uses the precise language for pleading professional malpractice, we agree with CHMS that the count entitled “Negligence” comes very close. CHMS argues that they are regulated by the State of Montana and that the Fort Peck Tribes have no authority to regulate them, and, if Fort Peck has no authority to regulate them, then there is no authority to adjudicate them either. (CHMS brief at page 11.) To support this proposition CHMS cite Strate and Wilson v. Marchington, 127 F.3d 805 (9th Cir. 1997). This argument fails for two reasons.
First, CHMS assumes that because it is a Montana professional corporation, only the State of Montana can “regulate” their professional activities. This presumption obviously fails when CHMS seeks to do business in another state or nation. Surely CHMS would not argue that the State of North Dakota would have no authority to regulate their accounting activities within the boundaries of that state. Why then would CHMS argue that the Assiniboine and Sioux Nation could not regulate their accounting activities? When the CHMS lawyers sought pleadings before the Tribal Courts, were they not required to appear before the Fort Peck bar and obtain either membership or admittance pro hoc vice? If the Tribes have the authority to regulate Montana lawyers that appear before their courts, if would necessarily follow that they would have the authority to regulate other professions as well. While we know of no licensure requirement imposed by Fort Peck on accounting firms operating within the exterior boundaries of the Fort Peck Reservation, it is enough that such authority is resident in the Tribes to impose such a requirement if they so choose.
Secondly, we see nothing in the WPCO complaint that would suggest that the Tribal Court would be interfering in any way with CHMS’ professional status in the State of Montana. Assuming that WPCO’s complaint alleges accounting malpractice against CHMS, we are not aware of any connection between CHMS’ Montana license and such malpractice action. It appears to us that WPCO is saying that CHMS held themselves out to WPCO as “possessing knowledge and expertise in bookkeeping, accounting, auditing and business” and that CHMS breached their duty to WPCO. WPCO does not seek to terminate the license of CHMS or to impede or impair CHMS’ ability to practice its stated profession in any way. Therefore, we hold that our Tribal Court does have jurisdiction to adjudicate reservation based malpractice claims against non-Indian professional corporations doing business within the exterior boundaries of the Fort Peck Indian Reservation
Incorporated issues. Our analysis of the organic documents, Montana/Strate, and real party in interest arguments regarding ICA and Shae are equally applicable to CHMS. The punitive damages argument does not apply in that WPCO does not seek such damages from CHMS. Accordingly, our holdings on those issues as to ICA and Shae are the same as to CHMS.
The Order denying ICA, Shae and CHMS’ Motion to Dismiss is affirmed. All Tribal Court orders heretofore stayed or not acted upon because of, or pursuant to, the pendency of this Review, are herewith *305 restored and shall be given full force and effect without further delay.
CONCUR: GARY M. BEAUDRY, Associate Justice, CARROLL J, DECOTEAU, Associate Justice.

. Article VII Section 9. The Tribal Executive Board is hereby authorized to recognize claim councils, district committees, and other organizations open to the membership of the Tribes, and to approve such organizations, and to provide financial support, services, or such other assistance as may be required to carry on programs beneficial to the membership of the Tribes.

. Tribal Executive Board Resolution # 1013-86-5, dated May 27, 1986

. Section 8. No authority contained in this Constitution and Bylaws may be delegated by the Tribal Executive Board to tribal officials, district councils, committees, delegates or associations, to carry out any functions for which this Tribal Executive Board assumes primary responsibility, except by ordinance or resolution duly enacted by the Tribal Executive Board in the legal session, and excepting those specific requirements contained in the Bylaws hereof.
Section 9. The Tribal Executive Board is hereby authorized to recognize claim councils, district committees, and other organizations open to the membership of the Tribes, and to approve such organizations, and to provide financial support, services, or such other assistance as may be required to carry on programs beneficial to the membership of the Tribes.

. It should be noted that IRC § 6110(k)(3) provides: Precedential status. Unless the Secretary otherwise establishes by regulations, a written determination may not be used or cited as precedent. The preceding sentence shall not apply to change the prece-dential status (if any) of written determinations with regard to taxes imposed by subtitle D of this title.

. Sec. 7871. Indian tribal governments treated as states for certain purposes.
(a) General rule. An Indian tribal government shall be treated as a State—
(I) for purposes of determining whether and in what amount any contribution or transfer to or for the use of such government (or a political subdivision thereof) is deductible under—

. In its Petition for Review, defendants cited only four issues, all of which are analyzed in this opinion. In its brief, defendants added an additional issue regarding WPCO's failure to allege the existence of a federally approved contract authorizing the employment of counsel to bring this action. We deny review of this additional issue inasmuch as it was not set forth in the original Petition for Review. Title IICCOJ 2000 § 207(b)

. The Raymond court went on to say, “It is not material to the present issue that this provision has been subsequently modified. It shows, as do subsequent treaties, that for more than a century this tribe of Indians had claimed and exercised, and the United States have guarantied and secured to it, the exclusive right to regulate its local affairs, to govern and protect the persons and property of its own people, and of those who join them, and to adjudicate and determine their reciprocal rights and duties” (id. at p. 722, our emphasis)

. Sec. 107. Civil jurisdiction of the Court.
The Court shall have jurisdiction over any action where one party to the action shall be an Indian, or a corporation or entity owned in whole or in substantial part by an Indian or the Tribes or a corporation or entity chartered by the Tribes; and
(a) the cause of action arises under the Constitution or laws of the Tribes; or
(b) an Indian party to the action resides on the Fort Peck Reservation

. Sec. 108. Jurisdiction over persons outside Reservation.
In a case where it otherwise has jurisdiction, the Court may exercise personal jurisdiction over any person who does not reside on the Fort Peck Indian Reservation if such person, personally or through an agent:
(a) transacts any business on the Reservation, or contracts or agrees anywhere to supply goods or services to persons or corporations on the Reservation; or
th) commits an act on the Reservation that causes injury

. There was apparently a factual dispute as to whether Gisela Fredericks, the plaintiff in Strate, was actually residing on the Fort Bert-hold reservation at the time of die accident. The U.S. Supreme Court held that her residence at the time of the accident was immaterial.

. CHMS, P.C. has offices in Glasgow and Wolf Point, MT. Wolf Point is located within the boundaries of the Fort Peck Indian Reservation.